1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

SYED ABBAS, On Behalf of Himself and All
Others Similarly Situated,

10

Plaintiff,

11          v.

12  OUTERWALL INC., JEFFREY J. BROWN,
NELSON C. CHAN, NORA M. DENZEL,
13  DAVID M. ESKENAZY, ROSS G.
LANDSBAUM, ERIK E. PRUSCH, and
14  ROBERT D. SZNEWAJS,

15          Defendants.

Case No. 2:16-cv-1275

**CLASS ACTION
COMPLAINT FOR
VIOLATION OF THE
FEDERAL SECURITIES LAWS**

**<u>JURY TRIAL DEMANDED</u>**

16          Plaintiff Syed Abbas ("Plaintiff"), by and through his undersigned counsel, for his

17  complaint against defendants, alleges upon personal knowledge with respect to himself, and

18  upon information and belief based upon, *inter alia*, the investigation of counsel as to all other

19  allegations herein, as follows:

20                          **<u>NATURE OF THE ACTION</u>**

21          1.      This is a class action brought on behalf of the public stockholders of Outerwall

22  Inc. ("Outerwall" or the "Company") against the members of Outerwall's Board of Directors

23  (the "Board" or the "Individual Defendants") for their violations of Sections 14(e) and 20(a) of

24  the Securities Exchange Act of 1934 (the "Exchange Act") and to enjoin the vote on a proposed

25  transaction, pursuant to which Outerwall and its subsidiary Redbox Automated Retail, LLC

26  ("Redbox") will be acquired by affiliates of Apollo Global Management, LLC ("Apollo

27  Management") through Apollo Management's  wholly-owned subsidiaries, Aspen Parent, Inc.

("Parent"), Aspen Merger Sub, Inc. ("Outerwall Merger Sub") and Redwood Merger Sub, Inc. ("Redbox Merger Sub", and together with Parent and Outerwall Merger Sub, "Apollo") (the "Proposed Transaction").

2.     On July 25, 2016, Outerwall and Apollo issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated July 24, 2016 (the "Merger Agreement") to sell Outerwall to Apollo.  Subject to the terms of the Merger Agreement, Outerwall Merger Sub commenced a tender offer (the "Offer") to purchase all of the outstanding shares of Outerwall common stock for $52.00 in cash for each share of Outerwall they own (the "Offer Price").  The Proposed Transaction is valued at approximately $1.6 billion.  The Offer commenced on August 5, 2016 and will expire on September 1, 2016.

3.     The Proposed Transaction is the result of an unfair process stemming not from the Board's concern for the best interests of stockholders, but rather from the Board's desire to avoid a proxy contest with an activist investor and potential ouster from their positions, and provides the Company's stockholders with inadequate consideration.  As described in more detail below, the Offer Price is inadequate and undervalues the Company.

4.     Outerwall and Apollo announced the Proposed Transaction just as the Company began to enjoy the results of initiatives to improve its financial results. The inadequacy of the Offer Price is evidenced by the fact that as recently as July 19, 2016, an analyst with B. Riley & Co. set a $58.00 per share price target for the Company—a $6.00 premium to the Offer Price. Further, Outerwall stock traded above the Offer Price as recently as December 7, 2015, when it traded as high as $56.75 per share.  Indeed, Company stock traded as high as $81.77 on July 22, 2015—just over a year prior to the announcement of the Proposed Transaction.

5.     Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires Outerwall to provide Apollo with the identity of any competing bidder and all material

CLASS ACTION COMPLAINT - 2
(NO. 2:16-cv-1275)

terms and conditions of such a proposal; (iii) "matching rights" that allow Apollo three (3) business days to match any superior offer, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer; (iv) a "no-waiver" provision restricting the Company and its subsidiaries from waiving, terminating, modifying or failing to enforce any material provision of any confidentiality or similar agreement to which Outerwall or any of its subsidiaries is a party; and (v) a provision requiring Outerwall to pay a termination fee of $26.9 million if it decides to pursue a competing bid.  The collective effect of these provisions is to strongly deter any potential post-deal market check.

6.      Finally, compounding the unfairness of the Proposed Transaction, on August 5, 2016, Outerwall filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the U.S. Securities and Exchange Commission ("SEC"). The Recommendation Statement, which recommends that Outerwall stockholders tender their shares pursuant to the terms of the Merger Agreement, omits or misrepresents material information concerning, among other things: (i) Outerwall's financial projections, relied upon by Outerwall's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"); (ii) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Morgan Stanley; and (iii) the background of the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding tendering their shares in connection with the Proposed Transaction.

7.      In short, the Proposed Transaction is designed to unlawfully divest Outerwall's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(e) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act.

9.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. Outerwall is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

11.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Outerwall.

12.     Outerwall, a Delaware corporation, delivers retail product and services to consumers via self-service interactive kiosks.  The Company's corporate headquarters are located at 1800 114th Avenue SE, Bellevue, Washington 98004.  Its common stock is traded on the NASDAQ under the ticker symbol "OUTR."

13.     Defendant Jeffrey J. Brown ("Brown") has been a director of the Company since April 2016.  Defendant Brown was appointed to the Board by Engaged Capital, LLC ("Engaged Capital") in connection with the Cooperation Agreement (defined herein).

14.     Defendant Nelson C. Chan ("Chan") has been Chairman of the Board since June 2013 and a director of the Company since July 2011.  Defendant Chan is Chair of the Nominating and Governance Committee, and is a member of the Compensation Committee.

CLASS ACTION COMPLAINT - 4
(NO. 2:16-cv-1275)

15.     Defendant Nora M. Denzel ("Denzel") has been a director of the Company since 2013, and served as Interim Chief Executive Officer ("CEO") from January 2015 to July 2015. Defendant Denzel is a member of the Nominating and Governance Committee.

16.     Defendant David M. Eskenazy ("Eskenazy") has been a director of the Company since August 2000.  Defendant Eskenazy is a member of the Audit Committee and the Compensation Committee.

17.     Defendant Ross G. Landsbaum ("Landsbaum") has been a director of the Company since July 2014.  Defendant Landsbaum is Chair of the Audit Committee, and is a member of the Nominating and Governance Committee.

18.     Defendant Erik E. Prusch ("Prusch") has been CEO and a director of the Company since July 2015.

19.     Defendant Robert D. Sznewajs ("Sznewajs") has been a director of the Company since August 2002.  Defendant Sznewajs is Chair of the Compensation Committee and is a member of the Audit Committee.

20.     Defendants Brown, Chan, Denzel, Eskenazy, Landsbaum, Prusch and Sznewajs are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

21.     Apollo Management is an American global alternative investment manager with its corporate headquarters located at 9 West 57th Street, 43rd Floor, New York, New York 10018.  Its common stock is traded on the New York Stock Exchange under the ticker symbol "APO."

22.     Parent is a Delaware corporation and a subsidiary of Apollo Management.

23.     Outerwall Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

24.     Redbox Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

25.     Redbox is a Delaware limited liability company and a wholly-owned subsidiary

CLASS ACTION COMPLAINT - 5
(NO. 2:16-cv-1275)

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

of Outerwall.

## CLASS ACTION ALLEGATIONS

26.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Outerwall common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.      Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.      The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of August 4, 2016, there were approximately 17,215,401 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Outerwall or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

29.      Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

        (a)      Whether Defendants have violated Section 14(e) of the Exchange Act;

        (b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        (c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

30.      Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### SUBSTANTIVE ALLEGATIONS

**Company Background and Strong Financial Outlook**

33.     Outerwall was incorporated in October 1993 and is a leading provider of automated retail solutions.  In 2013, the Company changed its name from Coinstar, Inc. to Outerwall.  The Company's core offerings in automated retail include its Redbox entertainment rental and purchase kiosk business, its Coinstar coin to cash conversion kiosk business, and its ecoATM electronic device sale kiosk business.  As of February 4, 2016, Outerwall operates 40,480 Redbox kiosks in 33,060 locations, 20,930 Coinstar kiosks in 19,660 locations, and 2,250 ecoATM kiosks in 2,020 locations.

34.     Over the past several months, Outerwall has undertaken efforts to improve its financial results.  In 2015, the Company discontinued operations of its Redbox subsidiary in Canada.  Outerwall also acquired certain assets and liabilities of Gazelle, Inc., and discontinued its SAMPLEit concept.  Notably, Outerwall has experienced seasonality in revenue from its business units, including historically high rental months during the summer and December.

35.     On February 4, 2016, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2015.  For the quarter, Outerwall reported revenues of $527.2 million, a decrease of 11.8% from $597.4 million year over year.  Net income was $17 million, a decrease of 61.1% from $43.8 million year over year.  For the full year, Outerwall reported revenues of $2.2 billion, a decrease of 4.3% from $2.3 billion year over year.  Net income for the year was $44.3 million, a decrease of 58.4% from $106.6 million year over year.  Commenting on the financial results, defendant Prusch

CLASS ACTION COMPLAINT - 7
(NO. 2:16-cv-1275)

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

stated:

> Due to our unrivaled network of retail partners and millions of loyal customers who value our products and services, Outerwall delivered solid 2015 results with strong free cash flow and core diluted EPS from continuing operations, despite challenging headwinds that continued to impact Redbox. We remain focused on strengthening our businesses, while continuing to return significant free cash flow to investors.
>
> Redbox is a compelling business, providing new movie releases to millions of loyal consumers at a great value. We will manage the business for profitability and cash flow, and we will continue our focus on expense management, operational efficiencies and network optimization. We are confident that millions of consumers will continue renting from Redbox for many years to come, as a majority of our customers use Redbox to complement digital alternatives. We fully intend to continue meeting the entertainment needs of our customers as we maintain our focus on providing value for all of our stakeholders.

36.     On February 8, 2016, activist investor Engaged Capital disclosed in a Schedule 13D filing a 14.6% ownership stake in the Company.  On February 18, 2016, Engaged Capital sent to the Board and publicly disclosed a letter and presentation outlining its belief that Outerwall is "significantly (and persistently) undervalued by the market."  Among other things, Engaged Capital's letter outlined steps it believed would improve the Company's financial results and stated that the Board should "begin a sales process with the goal of taking OUTR private."

37.     Also on February 18, 2016, the Company issued a press release stating its response to Engaged Capital's letter and presentation.  The press release stated, in pertinent part:

> Due to our unrivaled network of retail partners and millions of loyal customers who value our products and services, Outerwall delivered solid 2015 results with strong free cash flow and core diluted EPS from continuing operations, despite challenging headwinds that continued to impact Redbox. We remain focused on strengthening our businesses, while continuing to return significant free cash flow to investors.
>
> Redbox is a compelling business, providing new movie releases to millions of loyal consumers at a great value. We will manage the business for profitability and cash flow, and we will continue our focus on expense management, operational efficiencies and network optimization. We are confident that millions of consumers will continue renting from Redbox for many years to

CLASS ACTION COMPLAINT - 8
(NO. 2:16-cv-1275)

come, as a majority of our customers use Redbox to complement digital alternatives. We fully intend to continue meeting the entertainment needs of our customers as we maintain our focus on providing value for all of our stakeholders.

38.     On March 14, 2016, the Company issued a press release announcing that the Board initiated a process to "explore strategic and financial alternatives to maximize shareholder value," and had retained Morgan Stanley as its financial advisor.  Commenting in the press release, defendant Prusch stated:

> The increase of our quarterly dividend to this sustainable level, and the decision to explore strategic and financial alternatives both clearly demonstrate that the Outerwall Board of Directors and management team are committed to acting in the best interests of the Company and all shareholders. The Board and management team will evaluate all options thoughtfully and carefully with the support of our advisors.  Throughout the review process, Outerwall will remain focused on executing on our operational plans, managing our businesses for profitability and cash flow, and continuing to align costs with revenue to create operational efficiencies, while returning significant capital to our investors.

39.     On April 12, 2016, the Company issued a press release announcing that it had entered into a cooperation agreement with Engaged Capital, pursuant to which Outerwall appointed Engaged Capital-designee defendant Brown and two additional directors to be appointed to the Board on or before August 1, 2016 (the "Cooperation Agreement"). Commenting in the press release, Engaged Capital Principal and Chief Investment Officer Glenn W. Welling stated:

> We applaud Outerwall for initiating a process to explore strategic alternatives and are pleased to have been able to work constructively with the Outerwall Board and management team to ensure shareholder representation in the boardroom through this important phase of the Company's lifecycle. Jeff Brown brings decades of transaction and corporate governance experience to the Outerwall Board.  We look forward to continuing to work together with Jeff and the rest of the Board to ensure that the Board's decisions maximize value for shareholders.

40.     On April 28, 2016, Outerwall issued a press release announcing its first quarter of 2016 financial results.  For the first quarter, the Company reported revenues of $536 million, a decrease of 11.9% from $608.6 million year over year.  Net income was $38.5 million, an increase of 8% from $35.6 million year over year.  Commenting on the financial results,

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

defendant Prusch stated:

> Outerwall delivered solid results in the first quarter, demonstrating our continued ability to generate sustainable cash flow and profitability. We will continue to leverage our valued and compelling brands, millions of loyal customers, and an unrivaled network of kiosks and retail partners.

> Outerwall also initiated a process to explore strategic and financial alternatives to maximize value for shareholders that is well underway. The Board is involved in a comprehensive process and is committed to acting in the best interest of all shareholders.

41.     On July 28, 2016, Outerwall announced its financial results for the second quarter of 2015.  The Company reported revenues of $518 million, a decrease of 5% from $545.4 million year over year.  Net income was $40.5 million, a significant increase from a net income loss of $45.6 million year over year.  The Company's free cash flows were $60.1 million, an increase of 8% from $55.6 million year over year.  Commenting on the improved financial results, defendant Prusch stated:

> Outerwall achieved strong results in the second quarter, underscoring our ability to generate continued profitability and cash flow, and deliver shareholder value. Our second quarter results reflect solid execution company-wide, with improved sequential results at Redbox and the highest second quarter revenue in Coinstar's 25-year history. We also made substantial progress at ecoATM and continue to expect the business to achieve segment operating profitability for 2016.

**The Background of the Proposed Transaction**

42.     The Company has been approached by and engaged in informal discussions with various third parties interested in strategic opportunities, including preliminary discussions with representatives of Apollo in 2014, 2015 and January 2016 regarding a potential sale of the Company.

43.     On December 7, 2015, the Company issued a press release and filed a Form 8-K with the SEC updating guidance for full year 2015 reflecting declining performance of the Redbox business line.  During the following five trading days, Outerwall shares fell from $58.06 to $39.24.  On February 4, 2016, the Company again issued a press release and filed a Form 8-K with the SEC disclosing declining performance and outlook.  During the following five trading days, Outerwall shares again fell from $32.69 to $25.83.

CLASS ACTION COMPLAINT - 10
(NO. 2:16-cv-1275)

44.     On February 5, 2016, Engaged Capital telephoned the Company to inform Outerwall it had acquired 14% of Outerwall's outstanding shares.  On February 18, 2016, Engaged Capital's holdings were disclosed in a Schedule 13D filed with the SEC and a public letter and presentation to the Board.  Pursuant to the Cooperation Agreement dated April 11, 2016, the Board agreed to add three directors recommended by Engaged Capital (one director to be appointed immediately and two others to be appointed on or before August 1, 2016) and retain separate legal counsel in connection with the Board's evaluation of strategic and financial alternatives.

45.     On March 4, 2016, the Board authorized the Company to engage Morgan Stanley as its financial advisor.

46.     On March 13, 2016, the Board held a meeting during which it authorized an increase in the quarterly dividend from $0.30 to $0.60 per share and authorized management to publicly announce the Company's exploration of strategic and financial alternatives.

47.     On March 14, 2016, the Company publicly announced that the Board had initiated a process to explore strategic and financial alternatives to maximize stockholder value, and was declaring an increase in quarterly dividend payable to stockholders.  Following the announcement, various third parties contacted Morgan Stanley and the Company regarding exploring a potential transaction.

48.     Between late March and late June 2016, Morgan Stanley contacted 53 potential bidders, and distributed to 42 potential bidders a preliminary "teaser" containing public information about the Company.  Non-disclosure agreements ("NDAs") were negotiated and entered into with an undisclosed number of interested bidders, and the interested bidders were provided with additional information and materials.

49.     Between April 18, 2016 and May 6, 2016, defendant Prusch and Outerwall Chief Financial Officer Galen Smith met in-person and telephonically with 15 potential bidders.  The Company responded to various inquiries from the potential bidders in connection with their evaluation of the Company.

50.     During the last week of April 2016, Morgan Stanley sent a process letter to 22 potential bidders with instructions for the submission of initial indications of interest by May 5, 2016.  Also in late April 2016, the Board retained Wachtell, Lipton, Rosen & Katz as additional legal representation.

51.     Between May 5, 2016 and May 9, 2016, Morgan Stanley received eight indications of interest ranging from $27.00 to $57.00 per share in cash.  Apollo's indication of interest was in the range of $50.00 to $55.00 per share, and a party referred to in the Recommendation Statement as "Company A" submitted an indication of interest of $48.00 per share.  A party referred to in the Recommendation Statement as "Company B" submitted an indication of interest in the range of $55.00 to $57.00 per share.

52.     On May 9, 2016, the Board held a meeting during which it reviewed the initial indications of interest.  The Board directed Morgan Stanley to inform the potential bidders with indications of interest in excess of $45.00 that they would be invited to move forward in the process and would need to significantly increase their indications of interest to proceed.  The continuing bidders were granted access to an electronic data room and scheduled in-person management presentations with the Company.

53.     On May 12, 2016, Morgan Stanley received a ninth indication of interest from a strategic institution at $51.00 per share, but the indication of interest was subsequently withdrawn.

54.     On June 3, 2016, at the direction of the Board, Morgan Stanley distributed final bid process letters to the five remaining parties, including Apollo and Company A.  The final process letter indicated a final bid submission deadline of June 24, 2016.

55.     On June 24, 2016, Apollo and Company A each submitted final bid proposals and related documentation.  Apollo's bid was $50.00 per share in cash, and Company A's bid reaffirmed its prior indication of interest of $48.00 per share in cash.  Company B submitted its final bid proposal on June 26, 2016, proposing a transaction in the range of $43.00 to $45.00 per share in cash.  The other two parties that had received final bid process letters declined to

1    submit a final bid proposal.

2        56.    On June 26, 2016, the Board and its advisors held a telephonic meeting to

3    review the revised proposals.  After noting that Company B's proposed price range had

4    significantly decreased from its initial indication of interest, the Board instructed Morgan

5    Stanley to inform Apollo and Company A that it desired to complete its review of strategic and

6    financial alternatives in July.

7        57.    On June 29, 2016, the Board held a meeting during which it determined that

8    Company B would not be continuing in the process following its significantly lower indicative

9    valuation.

10       58.    On July 21, 2016, the Company received final bid packages from Apollo and

11   Company A, which included revised draft merger agreements.  Apollo proposed an all-cash

12   offer price of $50.00 per share, but restricted the Company's ability to pay any dividends,

13   including its regular third quarter dividend of $0.60 per share.  Company A proposed an all-

14   cash offer price of $48.00 per share and permitted the Company to pay its regular third quarter

15   dividend.

16       59.    On July 22, 2016, the Board held a meeting to discuss the current status of the

17   sale process.  Morgan Stanley informed the Board that it could provide a fairness opinion for

18   both Apollo and Company A's bids.  The Board instructed Morgan Stanley to request that each

19   bidder present its best and final offer over the course of the following weekend.

20       60.    On July 23, 2016, Company A indicated an offer price of $50.32 per share, an

21   increase from its previous offer of $48.00 per share.

22       61.    On July 24, 2016, Apollo indicated a final offer price of $52.00 per share, an

23   increase from its previous offer of $51.75 per share.  As part of its updated bid, Apollo agreed

24   to permit a one-time payment of the Company's regular third quarter dividend.

25       62.    Also on July 24, 2016, Company A further increased its offer price to $50.82 per

26   share.  That afternoon, the Board held a meeting to consider the final proposals from Apollo

27   and Company A.  The Board selected Apollo's offer, and Morgan Stanley provided its fairness

1   opinion to the Board.

2       63.     Following the Board meeting, Outerwall and Apollo executed the Merger

3   Agreement.

4   **The Proposed Transaction is Inadequate**

5       64.     On July 25, 2016, the Company and Apollo issued a joint press release

6   announcing the Proposed Transaction.  That press release stated, in relevant part:

7       BELLEVUE, Wash. and NEW YORK, July 25, 2016 -- Outerwall Inc.
        ("Outerwall" or the "Company") (Nasdaq: OUTR) today announced that it has
8       entered into an Agreement and Plan of Merger (the "Merger Agreement") with
        affiliates of certain funds (the "Apollo Funds") managed by affiliates of Apollo
9       Global Management, LLC (together with its consolidated subsidiaries, "Apollo")
        (NYSE: APO), a leading global alternative investment manager, pursuant to
10      which the Apollo Funds will acquire all of the outstanding shares of Outerwall
        common stock for $52.00 per share in cash.
11

12      The purchase price represents a premium of approximately 51 percent over
        Outerwall's closing stock price on March 14, 2016, immediately prior to the
13      announcement that the Company's Board of Directors initiated a thorough and
        comprehensive process to explore strategic and financial alternatives to
14      maximize shareholder value. The transaction, which was unanimously approved
        by Outerwall's Board of Directors, has a total enterprise value of approximately
15      $1.6 billion, including net debt.
16
                                          * * *
17

18      The transaction will be completed through an all-cash tender offer. The
        Outerwall Board of Directors unanimously recommends that Outerwall
19      shareholders tender their shares in the offer.

20      The transaction is conditioned upon satisfaction of the minimum tender
        condition, which requires that shares representing more than 50 percent of the
21      Company's common shares be tendered and the receipt of certain regulatory
        approvals and other customary closing conditions. The transaction is currently
22      expected to close during the third quarter of 2016. Following the transaction,
        Outerwall will become a privately held company and Outerwall's common
23      shares will no longer be listed on any public market.

24      65.     Given the Company's improving financial results and potential for increased

25  growth and strong earnings, the Proposed Transaction fails to adequately compensate

26  Outerwall's stockholders for the intrinsic value of the Company, as well as the significant

27

CLASS ACTION COMPLAINT - 14
(NO. 2:16-cv-1275)

benefits Apollo will receive from the Proposed Transaction.

66.     As recently as July 19, 2016, analyst Eric Wold with B. Riley & Co. set a $58.00 per share price target for the Company, a $6.00 premium to the Offer Price.  Further, Outerwall stock traded above the Offer Price as recently as December 7, 2015, when it traded as high as $56.75 per share.  Indeed, Company stock traded as high as $81.77 on July 22, 2016—just over a year prior to the announcement of the Proposed Transaction.

67.     In a July 25, 2016 *Seeking Alpha* article entitled "Outerwall Takeover: Are Shareholders Getting a Fair Deal?," the author noted that the Proposed Transaction "is a bit disappointing for those who were expecting a takeover a high premium, because you can make the case that Outerwall shares are worth much more than the takeover price."  The author elaborated:

> For example, Outerwall's first-quarter saw the company earn $53.8 million in free cash flow and $38.5 million in net income, or $2.29 per share, which crushed analysts estimates. Based on the company's full-year EPS guidance, it expected to earn between $5.35 - $6.55 per share. With a takeover price of $52 per share, this implies a P/E valuation of just 7.9-9.9.
> With annual EBITDA of approximately $400 million and an enterprise value of $1.6 billion, shares trade at an EV/EBITDA of just 4. With approximately $180 million in annual free cash flow, shares trade at a EV/FCF of 8.8 based on the takeover price.
>
> So yes, I am a bit disappointed by the takeover news as I feel Outerwall shares are worth a bit more than the buyout price. We will also never get to see if EcoATM will have been a profitable business following the recent acquisition of Gazelle, nor will we get to see if Redbox's digital app would have been a hit with consumers. The takeover also is not good news for shareholders who bought in mid-2015 when shares traded between $60-$80 per share.

68.     A July 25, 2016 *Los Angeles Times* article entitled "Redbox owner to be sold to Apollo Global Management for $1.6 billion" noted that the Company has been "quietly testing a new streaming service titled Redbox Digital," and that the new product is in its early stages and not yet available to the public.   The article also stated that the Company's Coinstar business "has continued to enjoy success."

69.     Importantly, the Proposed Transaction fails to adequately compensate

CLASS ACTION COMPLAINT - 15
(NO. 2:16-cv-1275)

Outerwall's stockholders for the significant benefits that Apollo will receive from the merger. In the July 25, 2016 joint press release, Apollo Management Partner David Sambur ("Sambur") touted the benefits to Apollo, stating:

> We are extremely excited for our funds to acquire Outerwall. Outerwall is a dynamic customer-focused business that delivers superior kiosk experiences that delight consumers and generate value for its retailer partners. We look forward to working with Outerwall's talented and dedicated team to continue the business's strong heritage of growth and innovation.

70.     Unfortunately for Outerwall's stockholders, despite the tremendous potential of the Company and the significant benefits to Apollo, the Board members failed to secure a fair deal for the Company.

**The Board Impermissibly Locked Up the Proposed Transaction**

71.     The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Outerwall's public stockholders with no meaningful change of control premium for their shares.   When viewed collectively, these provisions, which are detailed below, further the interests of Apollo, certain Individual Defendants and other Outerwall insiders to the detriment of Outerwall's public stockholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

72.     The Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents Outerwall from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 5.4(a));

- An "information rights" provision whereby the Company must notify Apollo, as promptly as practicable and within twenty-four hours, of any proposals or inquiries received from other parties, including, inter alia, the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 5.4(c));

- A "matching rights" provision obligating Outerwall to provide Apollo with three

CLASS ACTION COMPLAINT - 16
(NO. 2:16-cv-1275)

(3) business days' notice of its intent to accept a superior proposal and consider, in good faith, any subsequent offers from Apollo, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer (Merger Agreement, Section 5.4(e));

- A "no-waiver" provision restricting the Company and its subsidiaries from waiving, terminating, modifying or failing to enforce any material provision of any confidentiality or similar agreement to which Outerwall or any of its subsidiaries is a party (Merger Agreement, Section 5.4(a)); and

- A termination fee of $26.9 million payable by the Company to Apollo if Outerwall decides to pursue a competing bid (Merger Agreement, Section 7.6).

73. The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision, the "no waiver" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

74. The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will attempt to usurp Apollo and submit a higher bid for Outerwall. The possibility that a third-party bidder will emerge motivated Apollo to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Apollo could purchase the Company for less than would otherwise be possible.

75. Taken as a whole, the foregoing deal protection devices foreclose the possibility that a third-party "white knight" could step forward to provide Outerwall stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

76.     Outerwall insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  By ensuring the sale of the Company and heeding Engaged Capital's demand that the Board undertake a sale process, the Board members have not only saved themselves from the professional embarrassment and severe reputational damage of having control of the Board wrested away as a result of a proxy battle, but they have secured unique benefits from the Proposed Transaction not available to Plaintiff and the public stockholders of Outerwall.

77.     While Outerwall's public stockholders are being cashed out for an inadequate price and foreclosed from participating in the future growth of Outerwall, in connection with the merger the Company's directors and officers will achieve a substantial payday.  Under Section 2.3 of the Merger Agreement, upon consummation of the Proposed Transaction, Outerwall's directors and officers will receive cash payments for all outstanding stock options, restricted stock awards and company performance awards, whether or not vested, in amounts equal to the Offer Price - an opportunity that would not otherwise be available.  The table below sets forth the value to be received by the Company's named executive officers in connection with the Proposed Transaction for outstanding and unvested Outerwall equity awards:

| Name | Stock Options ($) | Restricted Stock ($) | Dividends or Dividend Equivalents ($) |
|---|---|---|---|
| Erik E. Prusch | — | 9,498,060 | 184,720 |
| Nora M. Denzel | — | 135,252 | — |
| Galen C. Smith | — | 2,844,296 | 43,181 |
| Donald R. Rench | — | 2,054,936 | 33,585 |
| James H. Gaherity | — | 1,231,984 | 18,752 |
| David D. Maquera | — | 953,836 | 15,969 |

78.     Further, defendant Prusch and certain Outerwall executive officers stand to receive millions of dollars in severance payments and other benefits in connection with the Proposed Transaction.  Notably, defendant Prusch will receive over $13.63 million in

CLASS ACTION COMPLAINT - 18
(NO. 2:16-cv-1275)

connection with the Proposed Transaction.  The merger-related compensation to be made to

defendant Prusch and five other named executive officers is set forth in the table below:

| Name (1) | Cash ($) (2) | Equity ($) (3) | Perquisites/ Benefits ($) (4) | Other ($) | Total ($) |
|---|---|---|---|---|---|
| Erik E. Prusch | 3,919,315 | 9,682,780 | 36,227 | — | 13,638,322 |
| Nora M. Denzel | — | 135,252 | — | — | 135,252 |
| Galen C. Smith | 739,858 | 2,887,477 | 22,831 | — | 3,650,166 |
| Donald R. Rench | 597,569 | 2,088,521 | 22,831 | — | 2,708,921 |
| James H. Gaherity | 452,121 | 1,250,736 | 24,151 | — | 1,727,008 |
| David D. Maquera | 580,164 | 969,805 | 24,151 | — | 1,574,121 |

79.     Further, Outerwall's executive officers may have apparently secured

employment following consummation of the Proposed Transaction.   In the joint press release,

Sambur stated: "We look forward to working with Outerwall's talented and dedicated team to

continue the business's strong heritage of growth and innovation."

80.     Instead of attempting to negotiate an agreement reflecting the best consideration

reasonably available for the Outerwall stockholders they are duty-bound to serve, the

Individual Defendants disloyally placed their own interests first, and tailored the terms and

conditions of the Proposed Transaction to meet their own needs and objectives.  The Board's

efforts to advance its members' and officers' personal interests at the expense of the

Company's public stockholders have resulted in the inadequate Proposed Transaction being

presented to the stockholders at an untenable and inadequate price.

81.     Therefore, while Outerwall's public stockholders will lose control of the

Company for an unfair price, certain Company insiders will substantially benefit if the

Proposed Transaction is consummated.

**The Recommendation Statement Contains Numerous Material Misstatements or Omissions**

82.     Compounding the unfair sale process and the inadequacy of the Offer Price, the

defendants also filed the materially incomplete and misleading Recommendation Statement

with the SEC and disseminated it to Outerwall's stockholders.   The Recommendation

Statement misrepresents or omits material information that is necessary for the Company's

stockholders to make an informed decision whether to tender their shares in support of the

Proposed Transaction.

83.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Outerwall's financial projections, relied upon by Outerwall's financial advisor, Morgan Stanley; (ii) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Morgan Stanley; and (iii) the background of the Proposed Transaction.   Accordingly, Outerwall stockholders are being asked to tender their shares in support of the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Outerwall's Financial Projections***

84.     The Recommendation Statement fails to disclose material information relating to the Company's intrinsic value and prospects going forward, including the financial projections provided by Outerwall management and relied upon by Morgan Stanley in conducting its financial valuation analyses.  With respect to Outerwall's financial projections, the Recommendation Statement fails to disclose the Core Case, Unrisked Strategic Case and Downside Case financial projections provided by Outerwall management and relied upon by Morgan Stanley for purposes of its analysis, for fiscal years 2016-2020, for the following items: (i) gross profit; (ii) changes in net working capital; (iii) EBIT (or depreciation & amortization); (iv) taxes (or tax rate); (v) net income; (vi) earnings per share; (vii) changes in net working capital; (viii) stock-based compensation expense; (ix) free cash flow (for the Unrisked Strategic Case and Downside Case only); (x) any other adjustments to unlevered free cash flows; (xi) unlevered free cash flow (for the Core Case and Downside Case only); and (xii) reconciliation of GAAP net income to non-GAAP unlevered free cash flow and non-GAAP EBITDA.

85.     In addition, with respect to the Core Case, the Recommendation Statement fails to disclose the details of (i) "certain upside and downside sensitivity scenarios focusing on projected effects of individualized assumptions"; and (ii) with respect to the "non-material updates to the Core Case" made in connection with preparing the Unrisked Strategic Case,

when the Core Case was updated and the nature of the updates.

86.    Omission of the aforementioned financial projections and details concerning the Core Case makes the following Recommendation Statement information false and/or misleading:

(a)    From pages 27-29 of the Recommendation Statement:

In the course of strategic and financial planning following public announcement of the Company's audited fiscal year 2015 financial results and condition and its 2016 annual financial guidance, as well as Engaged Capital's initial public announcement of its security holdings and interests in the Company, the Company's management prepared certain unaudited, non-public financial information for fiscal years 2016 through 2020, including financial projections for a core case as set forth below (the " Core Case ") and certain upside and downside sensitivity scenarios focusing on projected effects of individualized assumptions. This unaudited, non-public financial information, including the Core Case, was developed by the Company's management from February to March 2016 as part of management's preparation of its updated five-year business plan and financial overview to account for, among other things, changes in assumptions and estimates relating to the secular decline of the Redbox business since fourth quarter fiscal 2015. The updated five-year business plan and financial overview, including the Core Case, were presented by the Company's management to the Board on March 3, 2016, and were provided to Morgan Stanley to consider in its analysis regarding the Company's potential exploration of strategic and financial alternatives.

Following the Board's decision in mid-March 2016 to publicly announce that it had determined that the Company would explore strategic and financial alternatives, the Company's management using, among other things, the Core Case, prepared certain additional unaudited, non-public financial information for fiscal years 2016 through 2020, including financial projections for a strategic case as set forth below (the " Unrisked Strategic Case "), in coordination with the preparation of materials for marketing the Company to potential buyers in April through July 2016, which Unrisked Strategic Case materials were intended to demonstrate the Company's optimal financial performance assuming the Company were sold to a buyer that could, among other things, effectively execute on certain growth initiatives and implement various corporate cost savings, as well as there being a less steep unit rentals decline in the Redbox business. In connection with preparing the Unrisked Strategic Case, the Company's management also made some non-material updates to the Core Case, which are reflected in the projections set forth below.

In late June 2016, the Company's management, using the Core Case, prepared additional unaudited, non-public information for fiscal years 2016 through 2020 to reflect a downside case as set forth below (the " Downside Case " and,

together with the Core Case and the Unrisked Strategic Case, the " Company Forecasts "). The Downside Case materials were intended to provide context for the Board in considering the Company's strategic and financial alternatives, as well as buyer bids. On June 29, 2016 the Board reviewed the Company's other strategic and financial alternatives, as well as bids received from potential buyers.

Although the Company's management and the Board considered the Unrisked Strategic Case and the Downside Case, as well as other information regarding upside and downside sensitivities, in evaluating the Company's strategic and financial alternatives, the Company's management believed and represented to the Board that management's best estimate of the Company's future financial performance for purposes of long-term strategic and financial planning and evaluation of strategic and financial alternatives was the Core Case.

As part of the bidding process and in order to assist in the completion of applicable financial analysis and due diligence review of the Company in connection with the Transactions, the Unrisked Strategic Case was provided to potential bidders, including Management VIII and Company A. Morgan Stanley was provided, among other things, the Company Forecasts, and the Company Forecasts were used by Morgan Stanley in connection with the rendering of its financial opinion to the Board and in performing its related financial analyses, as described under " Item 4—The Solicitation or Recommendation—Opinion of the Company's Financial Advisor."

The following is a summary of the Core Case:

| | | Core Case ($ in millions) | | | |
| --- | --- | --- | --- | --- | --- |
| Fiscal Year | 2016E | 2017E | 2018E | 2019E | 2020E |
| Revenue | 2,015 | 1,786 | 1,691 | 1,564 | 1,475 |
| Adjusted EBITDA (1) | 383 | 389 | 361 | 316 | 286 |
| Capital Expenditures | 56 | 49 | 48 | 47 | 47 |
| Free Cash Flow (2) | 192 | 191 | 206 | 173 | 151 |

(1) Adjusted EBITDA is defined as net income plus depreciation and amortization; interest expense, net; income taxes; and share-based payments expense.
(2) Free Cash Flow is defined as net cash provided by operating activities less capital expenditures.

The Core Case projected growth rates for individual years that result in an 8% compound annual decline in revenue from fiscal year 2015 (actual revenue) through fiscal year 2020, primarily due to secular decline in unit rentals in the Redbox business. The Core Case key assumptions and estimates for fiscal years 2016 through 2020 reflect, among other things, an annual unit rental decline in the Redbox business of 14-21%, partially offset by product margin improvement in Redbox unit rentals and price increases in the Redbox and Coinstar

businesses, increased annual savings in the Coinstar business, and an increase in electronic devices and aggregate value per device collected in the ecoATM business.

The following is a summary of the Unrisked Strategic Case:

**Unrisked Strategic Case**
**($ in millions)**

| Fiscal Year | 2016E | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|
| Revenue | 2,029 | 1,924 | 1,923 | 1,897 | 1,979 |
| Adjusted EBITDA (1) | 388 | 434 | 434 | 416 | 430 |
| Capital Expenditures | 58 | 61 | 67 | 75 | 60 |
| Unlevered Free Cash Flow (2) | 220 | 237 | 263 | 234 | 253 |

(1)     Adjusted EBITDA is defined as net income plus depreciation and amortization; interest expense, net; income taxes; and share-based payments expense.

(2)     Unlevered Free Cash Flow is defined as net cash provided by operating activities less capital expenditures, plus tax-effected interest expense. In the materials provided in connection with the "fireside chats" to potential bidders, the Unrisked Strategic Case information was included in those materials except that the Unlevered Free Cash Flow amounts included therein were estimated at: $220 million for fiscal year 2016, $238 million for fiscal year 2017, $268 million for fiscal year 2018, $242 million for fiscal year 2019, and $261 million for fiscal year 2020. The difference between the initial Unlevered Free Cash Flow amounts for the Unrisked Strategic Case and the final Unlevered Free Cash Flow amounts for the Unrisked Strategic Case was due to differences in estimates of "cash in system" in connection with assumptions made relating to future international expansion in the Coinstar business.

The Unrisked Strategic Case projected growth rates for individual years that result in a 2% compound annual decline in revenue from fiscal year 2015 (actual revenue) through fiscal year 2020, primarily due to secular decline in unit rentals in the Redbox business. The key assumptions and estimates for fiscal years 2016 through 2020 underlying the Unrisked Strategic Case are the same as those underlying the Core Case, except that the Unrisked Strategic Case provided for a slower rate of unit rentals decline in the Redbox business (i.e., 20% decline in fiscal year 2016 and then 11-17% decline for fiscal years 2017 through 2020) and implementation of certain growth initiatives in the Redbox and Coinstar businesses, including provision of a digital sell-through video-on-demand service offering, a closed-loop marketing solution based on data accumulated through the Company's businesses and international expansion of the Coinstar business, and additional corporate cost savings.

The following is a summary of the Downside Case:

(1)     Adjusted EBITDA is defined as net income plus depreciation and amortization; interest expense, net; income taxes; and share-based payments expense.

The Downside Case projected growth rates for individual years that result in a 9% compound annual decline in revenue from fiscal year 2015 (actual revenue) through fiscal year 2020, primarily due to secular decline in unit rentals in the Redbox business. The Downside Case key assumptions and estimates are the same as those underlying the Core Case, except that the Downside Case provided for a higher rate of unit rentals decline in the Redbox business (i.e., 14-22% decline in fiscal years 2016 through 2020), lower margin improvements in the Redbox business due to higher product costs, lower annual savings in the Coinstar business, and no increase in electronic devices collected per kiosk per day and a lower increase in aggregate value per device collected in the ecoATM business.

|  | Downside Case<br>($ in millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| Fiscal Year | 2016E | 2017E | 2018E | 2019E | 2020E |
| Revenue | 1,980 | 1,716 | 1,588 | 1,446 | 1,341 |
| Adjusted EBITDA (1) | 349 | 342 | 311 | 264 | 232 |
| Capital Expenditures | 56 | 48 | 46 | 45 | 44 |

87.     These material omissions of the best estimates of the Company's financial future misleads Outerwall's stockholders by providing only selected information.  The omission needs to be remedied prior to the expiration of the tender offer in order to allow Outerwall stockholders to make a fully informed decision on the Proposed Transaction.

***Material Omissions Concerning Morgan Stanley's Financial Analyses***

88.     The Recommendation Statement describes Morgan Stanley's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Morgan Stanley's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Outerwall's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Morgan Stanley's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted

CLASS ACTION COMPLAINT - 24
(NO. 2:16-cv-1275)

information, if disclosed, would significantly alter the total mix of information available to Outerwall's stockholders.

89.     With respect to Morgan Stanley's *Discounted Cash Flow ("DCF") Analysis,* the Registration Statement fails to disclose: (i) the formula or definition of "free cash flow" utilized by Morgan Stanley in this analysis for each of the Core Case, Unrisked Strategic Case and the Downside Case and whether it is levered or unlevered (ii) the individual inputs and assumptions utilized by Morgan Stanley to derive the discount rate range of 8.6% - 9.7%; (iii) the basis for applying a range of NTM EBITDA multiples of 4.0x to 4.5x to calculate the terminal value and the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples; (iv) whether Morgan Stanley treated stock based compensation as a cash or non-cash expense; and (v) the net debt utilized by Morgan Stanley in this analysis.

90.     Omission of key inputs and assumptions underlying the discount rate Morgan Stanley used in its DCF Analysis make the following Registration Statement information false and/or misleading:

(a)     From pages 25-26 of the Registration Statement:

**Discounted Cash Flow Analysis**

Morgan Stanley performed a discounted cash flow analysis to determine a range of potential equity values per Share, using the financial projections provided by the Company's management in each of the Core Case, the Unrisked Strategic Case and the Downside Case, as provided by the Company's management. Morgan Stanley calculated the present value of estimated future cash flows and terminal value for the Company for the three and half years from June 30, 2016 through December 31, 2020 from the projections provided by management. Morgan Stanley calculated the terminal value for the Company by applying a range of NTM EBITDA multiples of 4.0x to 4.5x to the Company's estimated calendar year 2020 EBITDA. The free cash flows and terminal values were discounted to present values as of June 30, 2016 using discount rates ranging from 8.6% to 9.7%, which discount rates were selected, upon the application of Morgan Stanley's professional judgment and experience, to reflect an estimate of the Company's weighted average cost of capital. Based on the Company's net debt balance (excluding cash in kiosks, cash in transit and cash identified for settling accrued payables to retailer partners in relation to Coinstar kiosks) as of June 30, 2016 and the outstanding shares of the common stock of the Company on a fully diluted basis as provided by management, Morgan Stanley calculated (i) a range of potential equity values of $41.00 to $49.50 based on the Core

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Case, (ii) a range of potential equity values of $71.00 to $83.75 based on the Unrisked Strategic Case, and (iii) a range of potential equity values of $27.50 to $34.25, based on the Downside Case, in each case, per Share, as rounded to the nearest $0.25.

91.    There is no more material information to stockholders in a merger than the information underlying or supporting the purported "fair value" of their shares. Stockholders are entitled to the information necessary to inform a decision as to the adequacy of the merger consideration, which includes the ***underlying data*** (including management's projections) the investment bankers relied upon, the ***key assumptions*** that the financial advisor used in performing valuation analyses, and the range of values that resulted from those analyses. Here the analyses of Morgan Stanley incorporated certain critical assumptions that significantly affect the output (valuation) of the analyses. Without this material information, stockholders have no basis on which to judge the adequacy of Apollo's offer.

92.    In addition, Morgan Stanley apparently failed to perform a comparable companies analysis and a precedent transactions analysis.  If Morgan Stanley performed these analyses, the Recommendation Statement fails to disclose the details thereof.  These financial analyses are staples of fairness opinions whose omission calls into question the adequacy of Morgan Stanley's fairness opinion.

93.    The Recommendation Statement is false or misleading due to the omissions identified above.  Without such undisclosed information, Outerwall stockholders cannot evaluate for themselves whether the financial analyses performed by Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Morgan Stanley's opinions and analyses should factor into their decision to tender their shares.

*Material Omissions Concerning the Background to the Proposed Transaction*

94.   The Recommendation Statement also fails to disclose material information relating to, among other things, the background of the Proposed Transaction, including:

(a)   whether the Board interviewed and/or considered any financial advisor other than Morgan Stanley prior to engaging Morgan Stanley;

(b)   with respect to the NDAs Outerwall negotiated and entered into with "numerous potentially interested bidders" between late March and late June 2016: (i) how many NDAs Outerwall entered into with potential bidders; and (ii) whether the NDAs contain standstill provisions that are still in effect and currently preclude these potential bidders from making a topping bid for the Company ;

(c)   how Morgan Stanley determined which of the 53 potential bidders contacted would receive the process letter sent during the last week of April 2016;

(d)   the reasons why the strategic institution that submitted the ninth indication of interest on May 12, 2016 withdrew its indication of interest;

(e)   the reasons provided, if any, for why the other two parties that had received final bid process letters declined to submit a final bid proposal;

(f)   the details of any communications from, or meetings with, Engaged Capital regarding a sale process following the execution of the Cooperation Agreement; and

(g)   the timing and nature of any communications regarding future employment of Outerwall's management, including who participated in all such communications.

95.   The failure to disclose the information set forth above renders the following information from the Registration Statement false and/or misleading:

(a)   from page 14 of the Registration Statement:

On March 4, 2016, the Board met with the Company's management and representatives of Perkins Coie LLP ("Perkins *Coie*"), the Company's outside counsel, to discuss the Company's engagement of Morgan Stanley & Co. LLC (" *Morgan Stanley* ") to provide financial advice and services to the Company relating to activist stockholder matters and the potential evaluation and valuation of the Company and potential strategic and financial alternatives. The Board selected Morgan Stanley to act as its financial advisor based on Morgan

Stanley's qualifications, experience and expertise. At the meeting, the Board authorized the Company to engage Morgan Stanley to assist in such matters.

\* \* \*

Between late March and late June 2016, at the direction of the Board, Morgan Stanley contacted 53 potential bidders, including both financial sponsors and strategic institutions. Morgan Stanley distributed to 42 potential bidders that expressed interest in further evaluating a potential transaction, a preliminary "teaser" containing public information about the Company and its applicable business lines, and an accompanying form of non-disclosure agreement, prepared by Perkins Coie, relating to the acquisition of the entire Company or one or more business lines. During that period, the Company negotiated and entered into non-disclosure agreements with numerous potentially interested bidders, and provided those potential bidders with additional Company-related materials. In addition, at the direction of the Board, Morgan Stanley held introductory telephonic meetings with a number of the potential bidders that had signed non-disclosure agreements and continued to express interest in evaluating a potential transaction, providing them with additional information and materials on the Company.

\* \* \*

During the last week of April 2016, at the direction of the Board, Morgan Stanley sent a process letter with instructions for the submission of initial indications of interest regarding the acquisition of the entire Company or one or more of its business lines by May 5, 2016, to 22 potential bidders that continued to express interest in evaluating a potential transaction.

     (b)     from page 15 of the Registration Statement:

On May 12, 2016, Morgan Stanley received on behalf of the Company a ninth indication of interest from a strategic institution for a potential acquisition of the Company at $51.00 per share. This party subsequently withdrew its indication of interest for an acquisition of the entire Company, and indicated later in the process that its only potential interest was in acquiring a single line of business from the Company.

On June 3, 2016, at the direction of the Board, Morgan Stanley distributed final bid process letters to the five parties that remained, including Management VIII and Company A. The final process letter indicated a final bid submission deadline of June 24, 2016. Shortly thereafter, an auction draft merger agreement was posted to the electronic data room.

On June 24, 2016, pursuant to the instructions set forth in the final bid process letter, Management VIII and Company A each submitted final bid proposals and related documentation. Management VIII proposed an all-cash purchase price of

$50.00 per share and Company A reaffirmed its prior all-cash purchase price of $48.00 per share. Each proposal was subject to the completion of additional confirmatory due diligence. In addition, Management VIII previously submitted a mark-up of the draft merger agreement, while Company A did not at that time submit a mark-up of the draft merger agreement.

In the morning on June 26, 2016, Company B submitted its final bid proposal and related documentation. Company B proposed an all-cash purchase price range of $43.00-$45.00 per share. The Company B proposal was subject to the completion of additional confirmatory due diligence. In addition, Company B previously submitted a mark-up of the draft merger agreement. The other two parties that had received a final bid process letter declined to submit a final bid proposal.

96.    Defendants' failure to provide Outerwall stockholders with the foregoing material information renders the statements in the "Background of the Offer" and "Reasons for the Recommendation of the Board" sections of the Recommendation Statement false and/or materially misleading and constitutes a violation of Sections 14(e) and 20(a) of the Exchange Act. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement. Absent disclosure of the foregoing material information prior to the expiration of the tender offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act

97.    Plaintiffs repeat all previous allegations as if set forth in full.

98.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.

99.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender his shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

100.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender his shares.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

101.     Plaintiff repeats all previous allegations as if set forth in full.

102.     The Individual Defendants acted as controlling persons of Outerwall within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Outerwall and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

103.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities

CLASS ACTION COMPLAINT - 30
(NO. 2:16-cv-1275)

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

violations as alleged herein, and exercised the same. The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

105.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

106.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Outerwall, and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED this 12th day of August, 2016.

BRESKIN JOHNSON & TOWNSEND PLLC

By:   s/ Roger M. Townsend
     Roger M. Townsend, WSBA No. 25525
     1000 Second Avenue, Suite 3670
     Seattle, WA  98104
     Phone:  206-652-8660
     Facsimile:  206-652-8290
     rtownsend@bjtlegal.com

**OF COUNSEL:**

WEISS LAW LLP

By:   s/ Richard A. Acocelli
     Roger M. Townsend
     s/ Michael A. Rogovin
     Michael A. Rogovin
     s/ Kelly C. Keenan
     Kelly C. Keenan
     s/ Seth M. Rosenstein
     Seth M. Rosenstein
     1500 Broadway, 16th Floor
     New York, NY 10036
     (212) 682-3025

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Jamie Telegin
Jamie Telegin, Legal Assistant

CLASS ACTION COMPLAINT - 33
(NO. 2:16-cv-1275)

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660