THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| In re OUTERWALL INC., et al. STOCKHOLDER LITIGATION | Master File No. 2:16-cv-01275-JLR |
| This Document Relates To: ALL ACTIONS. | CLASS ACTION<br>CONSOLIDATED CLASS ACTION COMPLAINT |



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

Lead Plaintiff Mark Rudd ("Plaintiff") individually and on behalf of all others similarly situated, by the undersigned counsel, alleges the following based upon information and belief (except for facts concerning Plaintiff, which are alleged on knowledge), and upon a continuing investigation conducted by and through Plaintiff's counsel into the facts and circumstances alleged herein, which included, without limitation, review and analyses of: (i) the public filings of Outerwall Inc. ("Outerwall" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); and (ii) press releases, public statements, analyst reports, news articles, and other publications disseminated by or concerning Outerwall, affiliates of Apollo Global Management VIII, L.P. ("Apollo"), the Tender Offer and the Merger (as defined below).

## SUMMARY OF THE ACTION

1. This stockholder class action arises out of the acquisition of Outerwall by Apollo (the "Merger").

2. On July 25, 2016, Outerwall and Apollo announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), under which Apollo would acquire all of the outstanding shares of Outerwall common stock for $52.00 per share via tender offer ("Tender Offer").

3. Apollo commenced its Tender Offer on August 5, 2016. On the same day, Outerwall and its Board of Directors ("Board") filed a Schedule 14D-9 Solicitation/Recommendation Statement (together with all amendments, the "14D-9") with the SEC, recommending that Outerwall stockholders accept Apollo's $52.00 per share offer and tender their shares into the Tender Offer.

4. Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

5. The 14D-9 violated §14(e) in two ways. First, the 14D-9 contained affirmative statements promoting a set of financial projections that the Board knew did not present an accurate


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

view of the Outerwall's future prospects. These projections ("Merger Projections") assumed that the Company's Redbox and Coinstar businesses would not implement any growth initiatives and that the Company as a whole would rapidly decline in value over the next five years. However, as the Board was well aware: (i) Redbox was actively pursuing new growth initiatives in the digital on-demand video industry at the time of the 14D-9; (ii) Coinstar was actively pursuing an international expansion plan; and (iii) while Redbox's physical video market was declining, Outerwall expected that any revenue loss from that decline would be offset by value from Redbox's growth initiatives, including Redbox's venture into video games, and gains from Coinstar and Outerwall's new venture, ecoATM, which both were primed for growth in the future.

6. By knowingly promoting the overly pessimistic Merger Projections (which implied that Outerwall stock was only worth $41.00 to $49.50 per share), the Board induced stockholders to discount another set of financial projections prepared by Outerwall management (the "Growth Projections"). The Growth Projections, unlike the Merger Projections, assumed value from Redbox's and Coinstar's growth initiatives and assumed a slower rate of decline for Outerwall as a whole. Additionally, the Growth Projections, unlike the Merger Projections, did not support the $52.00 per share Tender Offer price as the Growth Projections implied that Outerwall stock was worth ***$71.00 to $83.75 per share***.

7. Second, in conjunction with the above, the 14D-9 omitted segment-by-segment forecast numbers for the Merger Projections and the Growth Projections. The Board only disclosed summary forecast numbers for the whole Company. By doing so, the Board knowingly obscured the major assumptions underlying the Merger Projections and the Growth Projections with respect to their disparate view of the relationship between the decline/growth trajectories of Redbox, Coinstar and ecoATM. By withholding this information, the Board made it difficult for stockholders to reject the Board's promotion of the Merger Projections as the most accurate view of the Company's future prospects.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

8. By disseminating the false and misleading 14D-9, defendants misled Outerwall stockholders into believing $52.00 per share was a good price for their shares and induced stockholders into tendering their shares into the Tender Offer. Outerwall's stockholders were damaged as a result of defendants' misconduct because the materially misleading 14D-9 caused stockholders to support a transaction that provided inadequate value for their shares of Outerwall common stock.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§78aa and 28 U.S.C. §1331.

10. This Court has personal jurisdiction over all defendants because they are all either a corporation that conducts business in and maintains operations in this District, or an individual who has sufficient minimum contacts with the State of Washington so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Outerwall is headquartered in this District and certain of the transactions, acts, practices, and courses of conduct constituting the violations occurred in this District. Moreover, defendants include persons who either reside or have extensive contacts within this District.

## PARTIES

12. Plaintiff was at all relevant times a stockholder of Outerwall.

13. Before the Merger, defendant Outerwall was an Delaware corporation headquartered in Bellevue, Washington.

14. Defendant Jeffrey J. Brown ("Brown") was a director of the Company since April 2016. He was appointed to the board as a nominee of Engaged Capital, LLC ("Engaged"), a former activist stockholder of Outerwall.

15. Defendant Nelson C. Chan ("Chan") was a director of the Company since July 2011. He also served as the Chairman of the Board since June 2013.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

16. Defendant Nora M. Denzel ("Denzel") was a director of the Company since January 2013. She also served as interim CEO from January 2015 to July 2015.

17. Defendant David M. Eskenazy ("Eskenazy") was a director of the Company since August 2000.

18. Defendant Ross G. Landsbaum ("Landsbaum") was a director of the Company since July 2014.

19. Defendant Erik E. Prusch ("Prusch") was a director and CEO of the Company since July 2015. Prusch also served as interim president of Redbox since December 2015.

20. Defendant Robert D. Sznewajs ("Sznewajs") was a director of the Company since August 2002.

21. The defendants named in ¶¶14-20 are collectively referred to as the "Individual Defendants."

**CLASS ACTION ALLEGATIONS**

22. Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all former public holders of Outerwall common stock who were harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

23. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

24. The Class is so numerous that joinder of all members is impracticable. According to the 14D-9, as of August 4, 2016, there were more than 17 million shares of Outerwall common stock outstanding.

25. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a) whether defendants have disseminated a false and misleading 14D-9 in violation of §14(e) of the Exchange Act, 15 U.S.C. §78n(e);

(b) whether the Individual Defendants are liable as control persons under §20(a) of the Exchange Act, 15 U.S.C. §78t(a); and

(c) whether the Class has suffered damages as a result of defendants' violations of the federal securities laws.

26. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff is not subject to any atypical defenses.

27. Plaintiff is an adequate representative of the Class, has no interests adverse to the Class, is committed to fairly and adequately protecting the interests of the Class, and has retained competent counsel experienced in litigation of this nature.

28. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

29. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

30. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND TO THE MERGER

31. Before the Merger, Outerwall was a company with three segments: Redbox, Coinstar and ecoATM.

32. Redbox is a self-service, kiosk system that allows customers to rent DVDs, Blu-ray movies and video games for a daily rental fee. As of February 2016, there were over 40,000 red,

automated Redbox kiosks located at over 33,000 locations such as convenience stores, fast food restaurants, grocery stores, mass retailers, and pharmacies.

33. Redbox has a unique niche in the video market. Redbox has newer movies available faster than Netflix. Redbox has movies available from Paramount, Lions Gate Entertainment, and Sony, as soon as these companies release them. Redbox has movies available from Fox, Universal, and Warner Brothers, 28 days after their release. In comparison, Netflix typically makes movies available to its customers months after their release dates. Redbox is also significantly cheaper than iTunes or other cable companies offering on-demand movies. Redbox's daily rental rate is $1.50 for DVDs and $2 for Blu-Ray Discs. iTunes and cable companies typically charge $5 to $6 for their on-demand movies.

34. Coinstar is a self-service, kiosk system that allows customers to convert their coins to cash or gift cards for a fee. As of February 2016, there were almost 21,000 green, automated Coinstar kiosks in over 19,500 locations such as grocery stores and Walmart. Coinstar also has kiosks in the UK, Ireland and Canada.

35. ecoATM is a self-service, kiosk system that allows customers to trade in old cell phones, MP3 players and tablets for instant cash. Outerwall purchased ecoATM in July 2013. As of February 2016, ecoATM had over 2000 kiosks in over 2000 locations such as malls, grocery stores and Walmart.

36. On May 1, 2014, Outerwall held an earnings call to discuss its Q1 2014 results. The Company's total revenue rose 4.7% year-over-year to $600 million. With respect to the three segments in comparison with the same quarter of the previous year:

- Redbox revenue increased $7.7 million, or 1.5%, to $515.7 million. Redbox generated approximately 200.0 million rentals in the quarter, an increase of 1.2%. Redbox same store sales increased 1.0%. Redbox operating income was $102.9 million, an increase of 11.7%. Redbox operating margin was 20.0%, an increase of 190 basis points.

- Coinstar revenue was $68.8 million, an increase of 5.2%. Same store sales grew 3.1%. The average transaction size in the first quarter of 2014 increased 3.9% to


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

$40.76. Coinstar operating income was $22.7 million, an increase of 22.1%, and Coinstar operating margin was 33.1%, an increase of 460 basis points.

- ecoATM increased revenue from just $4,000 to $16.0 million.

37. J. Scott Di Valerio ("Valerio") – Outerwall's interim President and CEO at the time – stated:

> Our Redbox line of business produced better than expected revenue and segment operating profit as rentals performed better in February despite the Winter Olympics spanning three weekends.
>
> Blu-ray continued to grow hitting 15.2% of rentals and 17.7% of revenue in the first quarter. And Redbox increased its segment operating margins by driving revenue with 38% less promotional dollars and through continued focus on optimizing cost across the business.
>
> Our Coinstar line of business also had a strong year-to-year results despite the challenges of severe weather in several markets. Average transaction size increased to $40.76 from $39.22 and segment operating margin increased 4.6 percentage points to 33% due to the price increase we implemented in the fourth quarter and our continued focus on optimizing costs.
>
> In our new venture segment, we continue to invest in building the infrastructure needed to scale ecoATM, or making progress in the mass merchant and grocery channels. I'm pleased with how quickly we have deployed a software solution to deal with the locked iPhone issue in the fourth quarter of 2013 and we saw collection rate improve in Q1.
>
> We are in the process of finalizing certain kiosks installation contracts and we continue to expect that we will hit our goal of approximately 1000 to 1200 kiosks installs this year.

38. On the same date, Outerwall explained that it would provide annual guidance only because of the variances in quarters brought about by, among other things, the seasonal patterns in the movie industry. Outerwall stated: "The company believes annual guidance is a more relevant measurement of the business given its stage of growth and full year results capture the varying seasonal patterns of each of its businesses."

39. On July 31, 2014, Outerwall held an earnings call to discuss its Q2 2014 results. The Company's total revenue came in at $549.2 million, a decrease of 0.7%. With respect to the three segments in comparison with the same quarter of the previous year:


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

- Redbox revenue dropped 6.9%, to $445.5 million. Redbox generated approximately 169.3 million rentals in the quarter, a decrease of 9.3%. Redbox same store sales decreased 7.8%. Redbox operating income was $83.5 million. Segment operating margin was 18.7%.

- Coinstar revenue was $79.9 million, an increase of 7.2%. Same store sales grew 6.7%. Coinstar operating income was $30.8 million, an increase of 21.1%, and Coinstar operating margin was 38.6%, an increase of 450 basis points.

- ecoATM increased revenue to $23.8 million.

40. With respect to Redbox, Outerwall explained that Redbox's performance was affected by the lack of availability of new release content in the quarter. Compared with June 2013, the box office in June 2014 was 83.0% lower, and there were only four titles released during the month. Outerwall noted, however, that consumer engagement remained strong and grew in the second quarter of 2014, with e-mail subscribers and Redbox app downloads growing by more than 20%. In addition, e-mail open rates, a measure of consumer interest in the product offering, increased 30%.

41. Valerio stated:

> Our results in Q2 was in the guidance range we gave in our call in May, with revenue at the low end of the range, core adjusted EBITDA from continuing operations at the midrange and core diluted earnings per share from continuing operations at the high end. We also produced strong, free cash flow in Q2. However, the weak slate of movies at Redbox significantly impacted rental patterns of our consumers, and the rollout of our ecoATM kiosk was slower than we expected as retailer contract negotiations took longer than we planned.
>
> June represented the lowest monthly theatrical box office in Redbox history. Box office was down 83% this June compared with June last year, with only 4 titles released during the month. The lack of appealing content and the popularity of World Cup soccer stunted the typical seasonal lift we get in June when summer vacation begins and contributed to lower-than-expected rentals in the quarter.
>
> However, consumer engagement continues to grow at Redbox, with our email subscriber list and total app downloads growing by more than 20% year-over-year. During the second quarter, we sent nearly 590 million emails to our email subscribers, with a 30% improvement in the open rate year-over-year. Also, Blu-ray continued to perform well and grew as a percent of Redbox revenue and rentals, which was in line with our guidance.
>
> Turning to our Coinstar business. Coinstar recorded its $1 billion transaction in the second quarter and has now processed more than 38 billion in dollars and coins in its 23-year history. Revenue, segment operating income and operating margin increased year-over-year, primarily due to the price increase we implemented last October.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> In our New Ventures segment, we continue to invest to scale ecoATM. Near the end of the quarter, we finalized certain kiosk installation agreements in the mass merchant and grocery channels. We installed approximately 70 net new kiosks in Q2 and more than 150 already in July. We expect to hit our target of approximately 1,000 to 1,100 kiosks by year-end 2014.

42. Galen Smith ("Smith"), Outerwall's CFO, stated: "Redbox continues to be a market leader for new release content and will continue to be a key distribution platform for many years to come."

43. After the earnings call, an analyst at Seeking Alpha observed that Outerwall was "far from the 'declining' stage of its life." The analyst wrote:

> On top of the company's ecoATM venture, its current segments are primed for growth as well. The company has already begun an international expansion.
>
> The company operates Redbox kiosks in Canada, and Coinstar kiosks in Canada, the UK, and Ireland. Management plans on installing kiosks in new countries in the future. If the company can continue this expansion, its revenue could increase dramatically.
>
> A successful international campaign for its current kiosk offering will pave the way for start-up ventures such as ecoATM to expand beyond U.S. borders.
>
> Outerwall has the potential to grow its revenue exponentially over the next few years. This potential for massive top and bottom line growth is simply not factored into Outerwall's current price.

44. On October 4, 2014, Outerwall announced that Redbox Instant would be shutting down. RedBox Instant was a joint effort with Verizon to offer a subscription-based streaming service that launched around March 2013. The service, which planned to compete with Netflix, was marred with issues early on as it became a popular avenue for credit card thieves. On October 19, 2014, Redbox officially withdrew from the joint venture, and received a $16.8 million payment from Verizon. In the Form 8-K announcing the termination of the joint venture, Outerwall stated: "To date, Outerwall has made total cash capital contributions to the Joint Venture of $77.0 million and has received total cash from the Joint Venture of $70.5 million, inclusive of revenue attributable to the rental of DVDs and Blu-ray Discs through the Joint Venture and the $16.8 million payment. In addition, Outerwall expects to realize approximately $29.9 million in cash tax savings through


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

deductions arising from the recognition of our share of the Joint Venture's losses through September 30, 2014."

45. Although Redbox Instant failed, it left Redbox with both: (i) valuable experience; and (ii) an already-built infrastructure to operate a digital streaming service, that Redbox could use or improve in the future.

46. In October 2014, Outerwall launched Redbox Play Pass Loyalty Program, a point-based loyalty program that gives registered email customers the opportunity to earn free DVD movie rentals.

47. On October 30, 2014, Outerwall held an earnings call to discuss its Q3 2014 results. The Company's total revenue came in at $552.9 million, a decrease of 5.7%. With respect to the three segments in comparison with the same quarter of the previous year:

- Redbox revenue dropped 11%, to $438.0 million. Rentals declined 13.7% to approximately $172.2 million. Same store sales decreased 11.8%, reflecting lower revenues in the quarter. Redbox operating income was $85.7 million. Redbox operating margin was 19.6%.

- Coinstar revenue was $85.1 million, an increase of 6.9%. Same store sales grew 5.8%. Coinstar operating income was $33.4 million, an increase of 20.9%, and Coinstar operating margin was 39.3%, an increase of 460 basis points.

- ecoATM increased revenue to $29.7 million.

48. With respect to Redbox, Outerwall explained that the year-over-year decrease in revenues was primarily due to soft flow-through from a weak release schedule in the second quarter of 2014 and the unfavorable timing and mix of content released in the third quarter of 2014.

49. With respect to Coinstar, Outerwall explained that factors impacting revenue growth included higher volume in the U.K. due to an increase in the U.K. kiosk base, a price increase in the U.K., and an increase in the number of Coinstar kiosks.

50. Valerio stated:

> In addition our optimization efforts in our Redbox segment including the initiatives such as rebalancing, implementing the vertical merchandizing zone and leveraging our CRM system have produced tangible results and will help offset the expected decline in the physical rental market.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> In fact utilizing our CRM capability we sent targeted promotions to many of our customers in Q3. This resulted in an improvement in the single night rentals and contributed to our higher average check year-over-year. Our consumer engagement remains strong. Unique credit cards renting and high frequency renters increased sequentially and we also saw year-over-year increases in email subscribers, email open rates, and app downloads.

51. After the earnings call, an analyst at Seeking Alpha observed that despite revenue decline, Outerwall managed to grow its earnings by 28% during the latest quarter. The analyst noted: "In Redbox, where the top line stumbled, the company managed to deliver gains through internal strategic actions. This is crucial to consider because at times when the demand contracts, an effective management can still prove to deliver benefits to the shareholders. Often, this point is overlooked by investors while making a purchase decision, but it highlights that Outerwall is a relatively safer stock to keep when market volatility rises." The analyst additionally observed that the kiosk market was growing fast: "The global retail-automation market is expected to grow at a CAGR of 16.7% till 2020."

52. On January 20, 2015, Outerwall announced that Valerio stepped down as CEO and resigned from the Board, and that defendant Denzel would serve as interim CEO. "We believe the company is well-positioned due to its strong operating and financial foundation and a deep and talented team of employees. Outerwall continues to capitalize on its market-leading brands to drive profitability and deliver value for shareholders, partners and customers," said defendant Chan, Chairman of Outerwall's Board in the press release announcing the change. "To accelerate the progress we are making, the Board believes that now is the right time for a leadership change."

53. On February 5, 2015, Outerwall held an earnings call to discuss its Q4 2014 and full year 2014 results. For Q4, consolidated revenue increased $6.9 million, or 1.2%, to $600.6 million. For the full-year 2014, consolidated revenue of $2.30 billion was essentially flat compared with full-year 2013 revenue with a decline of 0.2%. With respect to the three segments for the quarter:

- Redbox revenue was relatively flat at $494.0 million. Rentals declined 5.5% to approximately 181.3 million. Same store sales decreased 1.3%. Redbox operating income was $121.3 million and operating margin was 24.6%.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

- Coinstar revenue was $81.9 million, an increase of 1.5%. Same store sales grew 3.3%. Coinstar operating income was $33.6 million, an increase of 8.9%, and Coinstar operating margin was 41.0% in the fourth quarter of 2014, an increase of 280 basis points.

- ecoATM revenue was $24.7 million.

54. Denzel stated: "We're confident in Outerwall's long-term prospects. Redbox continues to be the leader in new release content. Coinstar generates strong free cash flow, and we believe ecoATM will provide strong returns in the years to come once that business is scaled."

55. Smith stated:

> Consumer engagement with Redbox remained strong in Q4. For example, in November, we launched Redbox Play Pass, our new loyalty program. And in just 2 months, 1.5 million new members signed up for the program. Also, there was a substantial year-over-year growth in consumer touch points, including 22% growth in e-mail subscribers.
>
> We continue to focus on managing Redbox for profitability by prudently controlling our costs and producing strong free cash flow. While other companies have moved away from physical media, we believe that we are uniquely positioned to take advantage of the long tail in physical rentals despite the secular decline in DVDs. Our recently announced extended content agreements further solidify our partnerships and extend the life of our kiosks.

56. After the earnings call, an analyst at Seeking Alpha observed that "Redbox is a cash cow throwing off tons of free cash flow and using up very little of it." The analyst stated: "Redbox is nimble and has mostly variable costs which can be scaled back when the business declines."

57. Another analyst agreed and observed Redbox:

> has a much lower operating cost than Blockbuster had, thanks to its automated kiosks. The latter feature also provides great flexibility to the company, as it can close the unprofitable kiosks at any moment without incurring high charges and can open new ones in promising areas with very low capital expenses. Therefore, Outerwall has very little in common with Blockbuster while it has a critical cost advantage over its current competitors, which provides it with an edge over the price-sensitive consumer. That's why Outerwall managed to maintain its revenue intact in 2014 even though the brick-and-mortar DVD business is going through a secular decline. This trend is evident in the most recent report of Digital Entertainment Group, which shows the % growth of each category of DVD sellers:

| | % growth in Q4 2014 |
|---|---|
| Brick-and-mortar | -14% |
| Subscription only (physical) | -20.6% |
| Kiosk | 0% |
| Electronic Sell-thru | 25.4% |
| Subscription streaming | 24.9% |

Therefore, while the conventional brick-and-mortar sales are plunging and the online streaming is booming, the kiosk business has remained intact. After performing an extensive survey on 526 Redbox users, Piper Jaffray reported that this trend is likely to persist. Piper Jaffray also stated that Outerwall will probably experience a very slow bleeding of its revenue instead of the collapse that other analysts predict.

58. In the Piper Jaffray report referenced above, the Piper Jaffray analyst stated:

While Redbox will experience secular headwinds in the coming years, we believe volume declines will prove to be more "slow bleed" than "fall off a cliff." Results from our Redbox user survey support this thesis. Of the 526 Redbox users surveyed, 70% said their usage was unchanged or increased in the last year vs. 30% who have used Redbox less. More importantly, 77% said they anticipate using Redbox a similar amount or more in the next year vs. 23% who anticipate reducing their usage. We believe the most significant risk to Redbox volumes would be a decline in on demand (cable/sat or Internet) pricing, which we view as unlikely as studios push to maintain movie purchase volumes. Hurdles related to title slate, etc., will continue to create volatility for Redbox, but significant secular decline does not appear imminent.

59. Another Seeking Alpha analyst agreed and observed: "Redbox's DVD rental business has got strong moat around itself and will take much more time to erode than what market is currently anticipating. . . . Physical DVD rental business is definitely on secular decline, however, Redbox has got long tail for the reasons mentioned above with enough strength to sustain it cash flow generating capabilities."

60. On March 30, 2015, Redbox announced a new contract with Warner Bros., under which Redbox secured the right to license theatrical and direct-to-video Blu-ray Disc and DVD titles released by Warner Home Video and WB Animation through March 31, 2017. "Redbox is an


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

important partner," stated Ron Sanders, president of Warner Bros. World Wide Home Entertainment Distribution. "And I am very pleased that we have finalized a new two year agreement."

61. On May 7, 2015, Outerwall held an earnings call to discuss its Q1 2015 results. The Company's reported total revenue of $608.6 million, the highest quarter in the company's history, and an increase of 1.8% from the same quarter the previous year. With respect to the three segments in comparison with the same quarter of the previous year:

- Redbox revenue increased $6.5 million, or 1.3%, to $519.5 million, a new quarterly record. Rentals declined 12.9% to approximately 173.0 million rentals. Redbox operating income was $122.9 million, an increase of 16.2% and operating margin was 23.6%, an increase of 300 basis points.

- Coinstar revenue was $69.3 million, an increase of $0.6 million, or 0.8%. Coinstar operating income was $22.5 million, a decline of 1%, and Coinstar operating margin was 32.5%.

- ecoATM revenue was $19.7 million.

62. Denzel stated:

> This was a very strong quarter for us with record revenue and solid bottom line growth. It's a great start to the year and we're very pleased with the results that the team delivered. We continue to be focused on optimizing Redbox and Coinstar and scaling ecoATM for profitable growth, all the while improving operational efficiencies across the company. Our results demonstrate our ability to focus on managing expenses, while continuing to allocate capital to the initiatives we believe will produce the highest returns, including disciplined investments in the business, repurchasing shares and paying dividends. Through this discipline and focus, we generated strong profitability in the quarter and significant free cash flow.
>
> I also want to reiterate that we're still committed to returning 75% to 100% of annual free cash flow to our shareholders. In the first quarter, we repurchased more than $40 million of Outerwall stock, and that represented over 600,000 shares. We also paid out our first quarterly cash dividend of $0.30, and today we announced our second dividend, which further demonstrates our confidence in Outerwall's solid financial foundation and long-term prospects.

63. Smith stated:

> Redbox revenue was up 1.3% despite a 29.3% year-over-year decline in box office for the quarter, reflecting the benefit from the price increase taken in December. Rentals were down 12.9% as a result of both the lower box office, including eight fewer releases in the quarter, as well as the impact on volume from the price increase. Net revenue per rental, or average check, increased from $2.58 in Q1 2014 to $3.00 in Q1 2015, primarily due to the price increases on movies and games.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> Redbox segment operating margin increased from 20.6% to 23.6% despite a one-time $15.2 million charge for restructuring and lease termination cost. Adjusting for these costs, segment operating margin would have been 26.6%. The improvement in segment operating margin was driven by higher revenue and lower direct operating and G&A expense as we continue to maximize the business for profitability. At the same time we continue to make small, strategic investments back into the business to mitigate the impact of secular decline such as investing in our loyalty program.

64. On June 4, 2015, Outerwall made a presentation at the Morgan Stanley Leveraged Finance Conference, where Smith indicated that the physical rental market for videos was expected to average $2.9 billion in revenue in 2016, $2.7 billion in 2017, and $2.6 billion in 2018:




65. According to the above SNL Kagan data, physical rentals was expected to decline by approximately 3% to 5% per year over the 2014 to 2019 timeframe – from 3.1 million rentals in 2015 to 2.4 million by 2019.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

66. On June 11, 2015, Redbox announced a new contract with Fox 20th Century Fox Home Entertainment. Pursuant to the two year deal, Redbox secured new-release titles by 20th Century Fox Home Entertainment through June 30, 2017.

67. On July 30, 2015, Outerwall announced that the Board appointed defendant Prusch as CEO.

68. On July 30, 2015, Outerwall held an earnings call to discuss its Q2 2015 results. The Company's reported essentially flat total revenue of $545.4 million. With respect to the three segments in comparison with the same quarter of the previous year:

- Redbox revenue decreased 0.9%, to $439.0 million, a modest year-over-year decline despite a 13.1% decrease in rentals. Rentals declined 13% to 146.0 million rentals. Redbox operating income was $122.9 million, an increase of 16.2% and operating margin increased 300 basis points to 22.5%.

- Coinstar revenue was $80.3 million, an increase of $0.4 million, or 0.5%. Coinstar operating income was $31.9 million, an increase of 3.6%, and Coinstar operating margin increased 120 basis points to 39.8%.

- ecoATM revenue was $26.1 million.

69. On October 29, 2015, Outerwall entered into a new agreement to purchase Gazelle, Inc. ("Gazelle") – for approximately $18.0 million. Gazelle was an e-commerce company that allowed customers to buy and sell used smartphones online. With Gazelle's assets, Outerwall believed it could accelerate ecoATM to profitability. Prusch commented that Gazelle would "enable ecoATM to gain critical mass, provide margin revenue uplift opportunities and leverage a direct-to-consumer channel for collected devices."

70. On October 29, 2015, Outerwall held an earnings call to discuss its Q3 2015 results. The Company's total revenue dropped 6.9% year-over-year to $512.1 million. With respect to the three segments in comparison with the same quarter of the previous year:

- Redbox revenue decreased 9% to $439.0 million, reflecting among other things, $3.9 million related to a decrease in revenue from kiosks removed as a result of continued efforts to optimize the network by removing underperforming kiosks. Rentals declined 29% to 132.6 million rentals, driven by, among other things, substantially lower box office which was 45.3% lower. Redbox operating income was $90.4

million, an increase of 2.4%, and operating margin increased 260 basis points to 22.9%.

- Coinstar revenue was $85.7 million, an increase of $0.4 million. Coinstar operating income was $34.5 million, an increase of 3.1%, and Coinstar operating margin increased 100 basis points to 40.3%.

- ecoATM revenue was $31.0 million.

71. Prusch commented with respect to Redbox:

> One of our initiatives at Redbox is video games, where the industry is currently undergoing a transition to new generation formats. We believe Redbox can drive revenue, as we provide both value to our industry partners and customers through our $3 a night video game rentals. Redbox has reached agreement with several of the leading game publishers that will allow us to increase the number of units in the kiosks to meet the growing consumer demand for new generation games.
>
> Redbox is increasing its investments in video games in the fourth quarter. The greater depth of content is necessary to generate consumer awareness and interest among Redbox consumers to enjoy a video game rental. We believe this is a natural extension to the success we've had in movies and it creates a unique customer proposition, whether it is a try-before-you-buy proposition or a try-and-then-buy proposition. We can take advantage of the growing proliferation of new gaming platforms, the growing demand for games, high sticker prices for games in an inefficient and fragmented rental market.

72. Prusch commented with respect to Coinstar:

> Moving to Coinstar, we are executing a test, land and expand strategy. We are currently planning several international tests in Western Europe. We've been successful in Canada, Ireland and the UK and have identified two countries for limited tests in 2016 with modest investments as we prove the kiosk economics.
>
> I want to emphasize these tests will be small and will measure the value proposition to consumers. If we are able to generate profitable results in new countries to that in North America, you should expect that we will expand pragmatically with a key focus on ROIC.
>
> International markets are attractive because many countries largely reflect the same economic dynamics we experience in the countries where we operate today. For the two countries we plan to test, our current technology requires no modifications to assess these new markets.

73. Prusch commented with respect to ecoATM:

> Our focus is on getting to profitability as quickly as possible. We plan to do that with our existing install base of kiosks, as well as our kiosks currently in inventory. The key is making sure we deploy these assets in the right locations. We continue removing underperforming kiosks and redeploying them in locations that satisfy our productivity thresholds, mostly in malls and mass merchants. We've also been doing



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> limited testing of ecoATM in several international markets; and although it is early, the results have been very promising due to less competitive market dynamics in the e-commerce space.
>
> Additionally, today, we are announcing the signing of a definitive agreement to acquire certain assets and liabilities of Gazelle. Gazelle will enable ecoATM to gain critical mass, provide margin revenue uplift opportunities and leverage a direct-to-consumer channel for collected devices. We're excited by the addition and we look forward to updating you on the combination after we close the transaction and integrate the assets.

74. On December 7, 2015, Outerwall announced that Redbox's then-president Mark Horak ("Horak") was leaving and Prusch would serve as interim president.

75. On December 7, 2015, Outerwall provided an update on its financial expectations for the full year 2015. Outerwall stated that for the full year 2015, the Company expected:

- Redbox revenue between $1.750 billion and $1.765 billion, compared with the prior range of $1.790 billion to $1.815 billion (representing a decline of about 2% on the bottom and 3% on the top end of the range);
- Consolidated revenue between $2.165 billion and $2.190 billion, compared with the prior range of $2.205 billion to $2.240 billion;
- Core adjusted EBITDA from continuing operations* between $460 million and $475 million, compared with the prior range of $490 million to $510 million;
- Core diluted EPS from continuing operations* between $7.65 and $8.15 on a fully diluted basis, compared with the prior range of $8.82 to $9.52; and
- Free cash flow* between $235 million and $255 million, compared with the prior range of $252 million to $282 million.

76. After the Outerwall update on guidance, an analyst at Seeking Alpha observed:

> Outerwall is down, but far from out. The market has overreacted to Monday's news of revised guidance. The poor Redbox results were mainly due to the worst box office in four years, and not due to other factors." The analyst noted the SNL Kagan study estimated that the demand for physical DVD rentals should decline, as expected, over the next 5 years in the 3% to 5% range, but this did not include video game rentals. The analyst noted: "Outerwall has just begun investing heavily in games lately with the steady consumer adoption of next-generation platforms (If you own a PS4 or an XBox One and just want to try 1 or 2 games before buying it, Redbox is the place to go).

77. On December 10, 2015, Smith attended the "Wedbush California Dreamin' Technology/Consumer Management Access Conference" during which he commented:


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> On Monday, we lowered our full-year guidance for Redbox revenue, which resulted in lower expectations for consolidated revenue, core adjusted EBITDA from continuing operations and core diluted earnings per share from continuing operations. Today, we'll go over what we saw in the preliminary results in terms of rentals and revenues and why it impacted margins to the degree we have guided. Nonetheless, we remain – we believe that Redbox remains a compelling business and it has ability to provide new releases to millions and millions of consumers at a great value. We are committed to take the necessary steps to build on strong brand and foundation and position Redbox for continued success.

78. At some point around this period, Engaged – an Outerwall stockholder – began an activist campaign against the Board.

79. On February 4, 2016, Outerwall announced its Q4 2015 and full year 2014 results. For the fourth quarter of 2015, consolidated revenue was $527.2 million, a decrease of 11.8%. For the full year 2015, consolidated revenue was $2.2 billion, a decrease of 4.3% compared with full-year 2014. With respect to the three segments:

- Redbox revenue decreased 9% to $439.0 million, reflecting among other things, $3.9 million related to a decrease in revenue from kiosks removed as a result of continued efforts to optimize the network by removing underperforming kiosks.
- Rentals declined 24% to 135.8 million rentals. Redbox operating income was $62.6 million, a decrease of 50.2%, and operating margin was 15.4%.
- Coinstar revenue increased $1.4 million, or 1.7%, to $83.3 million. Coinstar operating income was $31.2 million in the fourth quarter of 2015, a decrease of $2.3 million, and Coinstar operating margin decreased 350 basis points to 37.5%.
- ecoATM revenue was $36.8 million, an increase of 48.9%.

80. According to the 14D-9, Engaged called Outerwall on February 5, 2016 and warned that it was going public with its campaign.

81. On February 8, 2016, Engaged filed a Schedule 13D disclosing that it beneficially owned over 14% of the then-outstanding shares of the Company's common stock.

82. On February 18, 2016, Engaged filed an amendment to its Schedule 13D, including a letter outlining Engaged's concerns regarding the governance and management of the Company. In the letter, among other things, Engaged asserted that the Board squandered approximately $1.2 billion of shareholder capital in the last four years, and asserted that Outerwall's depressed valuation

was a direct result of the Board's failed strategies, flawed capital allocation policies, and misaligned governance. In the letter, Engaged demanded: "we believe the Board should immediately retain financial advisors and begin a sales process with the goal of taking OUTR private."

83. Faced with the threat of negative public scrutiny and the potential loss of their Board seats, the Board immediately agreed to meet and negotiate with Engaged. The Board quickly began taking steps to sell the Company.

84. On or around March 4, 2016, the Company engaged Morgan Stanley & Co. ("Morgan Stanley") as its financial advisor.

85. On March 14, 2015, Outerwall publicly announced that the Board had initiated a sales process.

86. According to the 14D-9, during the time Engaged continue to pressure the Board to sell the Company and after the Board agreed to launch a sales process, Outerwall management developed the Merger Projections and presented the projections to the Board on March 3, 2016. The Merger Projections presented a bleak view of Outerwall's future. The Merger Projections assumed that the Company's Redbox and Coinstar businesses would not implement growth initiatives and that the Company as a whole would rapidly decline in value over the next five years.

87. In addition to the Merger Projections, however, Outerwall's management had another set of financial projections, the Growth Projections, which presented a more optimistic view of the Company's prospects. The Growth Projections reflected a different scenario than that assumed by the Merger Projections. The Growth Projections:

- assumed 2% compound annual decline in revenue, compared to the 8% assumed in the Merger Projections; and
- unlike the Merger Projections, assumed "implementation of certain growth initiatives in the Redbox and Coinstar businesses, including provision of a ***digital sell-through video-on-demand service*** offering/ a closed-loop offering solution based on data accumulated through the Company's businesses and ***internal expansion of the Coinstar business***."



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

88. Around March 24, 2016, news leaked that Redbox was planning to launch an on-demand video streaming service called Redbox Digital. As reported in *Variety*, "*Variety* has learned from multiple sources familiar with the company's plans as well as a series of leaks that included concept screenshots and the logo of the service. A closed beta test may be available soon, according to one of those sources." The article noted that Redbox Instant (the joint venture with Verizon in 2014) had been unsuccessful in its attempt to compete with Netflix. The article noted: "But while Redbox Instant aimed to challenge Netflix with a subscription bundle, the company now seems to have more modest plans. Redbox Digital is being built as a video-on-demand store similar to iTunes, Vudu or Google Play. Consumers will be able to rent movies or TV show episodes for streaming, or purchase digital copies." The article concluded: "There is a case to be made that Redbox will be more successful this time around. By integrating tightly with its existing service, the company is essentially targeting millions of Redbox users who already use its website and apps to review and reserve their DVDs. Soon, those consumers may have a choice: Hold a movie for $1.50 at the local store, or start watching it right away without leaving the house for a few dollars more."

89. On April 11, 2016, Engaged agreed to stop publicly disparaging the Board and entered into a Cooperation Agreement with Outerwall. In exchange, the Board agreed to immediately include Engaged's nominee – defendant Brown – as a Board member. The Board also agreed that Engaged could appoint two additional directors on August 1, 2016. In essence, the August 1, 2016 date essentially provided a deadline for the Board to negotiate a sale of the Company, or else, potentially re-trigger the public fight with Engaged.

90. On April 28, 2016, Outerwall held an earnings call to discuss its Q1 2016 results. Consolidated revenue was $536 million, a decrease of 11.9%. With respect to the three segments:

- Redbox revenue decreased 18.9% to $421.5 million, reflecting among other things, $10.2 million attributable to kiosks removed or relocated as a result of continued efforts to optimize the network by removing underperforming kiosks. Rentals declined 20% to 137.7 million rentals. Redbox operating income was $84.2 million, a decrease of 31.4%, and operating margin was 20.0%.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

- Coinstar revenue climbed $72.4 million in the first quarter of 2016, an increase of $3.0 million or 4.4%. Coinstar operating income was $24.6 million in the first quarter of 2016, an increase of $2.1 million or 9.3%, and Coinstar operating margin increased 150 basis points to 34.0%.

- ecoATM revenue increased $22.3 million, or 113.1%.

91. Prusch commented that despite the year-over-year numbers, Redbox delivered sequential growth:

> During the quarter, we achieved consolidated revenue of $536 million, a sequential improvement from the $527 million in Q4. In addition, we generated $54 million in free cash flow this quarter and core diluted EPS of $2.44. These results are a testament to the significant value our businesses offer to our millions of loyal customers and retail partners and demonstrate our continued ability to generate solid cash flow and core EPS.
>
> Looking across our business results for the first quarter, we were pleased with the stabilization we saw in the business with Redbox delivering sequential growth in revenue and rentals. Redbox revenue was $421 million, which is up sequentially from the $407 million of revenue in Q4 2015. Rentals were up from Q4 with a stronger average check as we benefited from higher game rentals and lower promotional spend.
>
> Further, we saw a sequential increase in our high frequency renters or HFRs due to our ongoing efforts to engage and retain customers coupled with new content introduced during the quarter. Beyond movies, our new release game rentals continue to perform well across our network of kiosks. Specifically, popular new generation titles from Q4 2015 helped to drive rentals in the quarter. In fact, we conducted a field survey in March that emphasized high marks in customer satisfaction and indicated the majority of customers, roughly 80%, see game rentals as a way to influence their purchasing decisions. Clearly, we're filling a try before you buy market need and we will continue to invest in the right titles across consoles to take advantage of this market opportunity and support the needs of our customers.
>
> In addition, our popular Play Pass loyalty program grew more than 100% year-over-year to nearly 4 million customers with membership increasing sequentially by 19%. Loyal Play Pass members continue to be some of our most valuable customers representing 13% of all rentals and 50% of all online transactions.
>
> Looking ahead, Redbox remains a very large and compelling business with one of the strongest brands in home entertainment, providing new movie releases and games to millions of consumers. We continue to believe that this will be the case for many years to come.

92. Smith also stated that the Company expected the next quarter to be successful for Redbox as Outerwall expected significantly higher box office. Smith stated: "For Redbox, Q2 2016


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

box office is expected to be $3 billion, ***an increase of $912 million or 43%*** compared with Q2 2015 with three more titles."

93. Prusch commented with respect to Coinstar: "Coinstar installed its first coin-counting kiosk in Spain to begin testing the service in an additional country and plans to expand the test as well as explore other international opportunities."

94. On July 21, 2016, news leaked that Outerwall had started officially testing its digital streaming service named "Redbox Digital."

95. On July 24, 2016, about a week before the August 1, 2016 deadline by Engaged, Outerwall completed its negotiation of the Merger.

96. On July 24, 2016, the Board had a meeting to vote on Apollo's $52.00 per share offer. Morgan Stanley presented its fairness analyses based on the Merger Projections. Relying on Morgan Stanley's fairness analyses, the Board unanimously approved the Merger.

97. Following the July 24, 2016 meeting, the Board executed the Merger Agreement.

98. On July 25, 2016, Outerwall announced the Merger Agreement.

99. On August 5, 2016, Apollo commenced the Tender Offer, set to expire September 1, 2016.

100. On August 5, 2016, defendants filed and disseminated the 14D-9 with the SEC, recommending that the Company's stockholders accept the Tender Offer and tender their shares in the Tender Offer.

101. On September 1, 2016, Apollo disclosed that approximately 28.1% of the outstanding shares of common stock of Outerwall were tendered, and that Apollo would be extending the offering period to September 22, 2016.

102. On September 23, 2016, Apollo disclosed approximately 69.3% of the outstanding Outerwall shares were tendered.

103. On September 27, 2016, Outerwall announced the completion of the Merger. Apollo announced that Smith was Redbox's new CEO.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

104. On January 18, 2017, Redbox announced a new agreement for 2017 with Paramount Home Media Distribution, under which Redbox would able to provide same-day release of Paramount titles.

**THE FALSE AND MISLEADING 14D-9**

105. To secure stockholder support for the Merger, defendants disseminated the materially misleading and inadequate 14D-9 in violation of §14(e) of the Exchange Act.

**The Promotion of the Merger Projections as the Most Accurate View of Outerwall's Future Prospects**

106. In the 14D-9, defendants promoted the Merger Projections as reflecting the most accurate view of the future prospects of the Company. The 14D-9 stated on page 27 that "management's best estimate of the Company's future financial performance for purposes of long-term strategic and financial planning and evaluation of strategic and financial alternatives was the [Merger Projections]." The 14D-9 stated on page 27 that the Growth Projections, in comparison, were "materials for marketing the Company to potential buyers."

107. This representation was objectively and subjectively false for at least three reasons.

108. First, the Merger Projections assumed Redbox would not implement a digital video-on-demand service and assigned zero value for that program. However, as the Board was well aware, Redbox was actively pursuing a digital on-demand service program at the time of the Merger, called Redbox Digital. Redbox Digital was not a speculative concept. Redbox Digital was the culmination of a long process for Redbox to add on a digital service, a process in which Redbox invested for over two years:

- In 2013, Redbox developed and launched a subscription-based, digital service to compete with Netflix;
- In 2014, Redbox Instant failed, but left Redbox with both: i) valuable experience and ii) an already-built infrastructure to operate a digital streaming service, that Redbox could use or improve in the future;
- In 2015, Redbox began developing an on-demand digital service to be tightly integrated with its existing service and targeting Redbox users who already used Redbox's website and apps;


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

- Four days before the announcement of the Merger, news leaked that Redbox began the official testing stage of Redbox Digital.

109. Moreover, as the Board was also well aware, Redbox Digital promised significant future value for Outerwall stockholders. The digital entertainment market is booming. As a June 15, 2015 *Time* article noted, revenues from streaming and download movies was expected to surpass revenues from buying and renting DVDs for the first time in 2015. Today, customers expect entertainment instantly, wherever they are – whether they are at home, in the car or at the gym. Numerous devices today offer instant digital streaming – including smart TVs, streaming media boxes, game consoles and dongles (Google Chromecast and Amazon fire stick). Cell phones and tablets allow customers to view movies or shows while traveling. Redbox is well-positioned to take advantage of this boom. Its name and brand is already well-recognized. It has the infrastructure to implement a digital service. It has signed deals with big movie companies. It can provide something Netflix cannot – instant new release movies at a competitive price, without monthly fees. It has a large, established customer base, including from its loyalty program that included nearly four million customers (with membership increasing sequentially by 19%) as of April of 2016.

110. Unsurprisingly, defendants expended significant money developing a digital service for Redbox, right up to the time of the Merger. Defendants did so with the expectation that Redbox's digital service would succeed and return value in the future. Thus, defendants' representation in the 14D-9 that they believed the Merger Projections, which assigned zero value to Redbox's digital service, was the most accurate view of Outerwall's future prospects was an objectively and subjectively false representation.

111. Second, the Merger Projections assumed that Coinstar would not implement international expansion of its business. However, as the Board was well aware, Outerwall was successfully introducing Coinstar in the international market at the time of the Merger. In October 2015, Prusch told stockholders that Coinstar was successful in Canada, Ireland and the UK and would test two additional countries. On April 28, 2016, Prusch told stockholders that "Coinstar



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

installed its first coin-counting kiosk in Spain to begin testing the service in an additional country and plans to expand the test as well as explore other international opportunities."

112. Like with Redbox Digital, it is unlikely that defendants agreed to invest in and pursue Coinstar's international expansion without the expectation that it would succeed and return value in the future. Thus, defendants' representation in the 14D-9 that they believed the Merger Projections, which assigned zero value to Coinstar's international expansion, was the most accurate view of Outerwall's future prospects was an objectively and subjectively false representation.

113. Third, in addition to assuming no value for Redbox digital and Coinstar international, the Merger Projections assumed an 8% compound annual decline in Outerwall's total revenue from fiscal year 2015 to fiscal year 2020 "primarily due to secular decline in unit rentals in the Redbox business."

114. As defendants were well aware, by virtue of their corporate positions in Outerwall and their review and preparation of the Company's financial results each quarter for SEC filings in the years preceding the Merger, Outerwall's financial performance in the years preceding the Merger does not support the 8% decline assumption.

115. The paragraphs above detail a two-year history for Outerwall's financial results. *See infra* at ¶¶31-104. This history shows that Redbox video rentals fluctuated on a quarterly basis, depending on factors like the box office titles available that quarter. However, Outerwall was a company that could respond quickly and implement flexible strategies to offset any impact of decline in Redbox video rentals on the Company's total revenue number. Outerwall consistently issued public statements over the past two years touting Outerwall's ability to, in Smith's own words, "mitigate the secular decline" in the industry.

116. For example, Outerwall could, and did close or relocate Redbox kiosks. Outerwall was able to easily "close the unprofitable kiosks at any moment without incurring high charges and [could] open new ones in promising areas with very low capital expenses."

117. Outerwall also could, and did, raise rental prices. Outerwall raised Redbox rental prices 25% in December 2014. On May 7, 2015, when Outerwall reported its first quarter, Outerwall reported a ***new record high*** of total revenues of $608.6, an increase in 1.8%, despite the fact that there was a 29.3% decline in box office for the quarter, and Redbox rentals ***declined*** 12.9% in the same quarter.

118. Outerwall also could, and did, capitalize on the video game market. While the video rental market was expected to decline over the next few years, this expectation was not shared by the video game market. In or around October 2015, Redbox began investing heavily in video games, where the industry was transitioning to new formats. Shortly, Redbox reached agreement with several leading game publishers. By April 2016, Outerwall reported that for its first quarter 2016, new release game rentals were performing well across Redbox's network of kiosks. In June 2016, *Nasdaq.com* published an article noting that the video game industry "generates more revenue than the movie and music industry," and that the total revenues in 2015 in the U.S. for the video game industry eclipsed $23.5 billion.

119. In addition to its emerging Redbox video game business, Outerwall also had the Redbox digital and Coinstar international growth initiatives, discussed above. Outerwall also had ecoATM, which was newly partnered with Gazelle, and primed for significant growth in the near future.

120. In 2014, Outerwall's total revenue declined only 0.2% year-over-year. In 2015, Outerwall's total revenue declined 4.3% year-over-year due to what has been called the worst box office in four years. Defendants expected the box office in 2016 to significantly improve. Considering Redbox's historical performance and its future prospects, the Merger Projections' assumption of an 8% compound annual decline in total revenue was overly pessimistic and did not represent the long-range value of the Company.

121. Defendants – by virtue of their corporate positions in Outerwall, their review and preparation of the Company's financial results each quarter for SEC filings in the years preceding

the Merger, and their knowledge of the Company's growth initiatives – had contemporaneous information indicating that the Merger Projections contained flawed assumptions and did not reflect an accurate view of the Company's future prospects at the time defendants reviewed, prepared and filed the 14D-9. Defendants promoted the Merger Projections because they were self-interested in the Merger.

122. Defendants prepared and accepted the Merger Projections after Engaged publicly demanded a sale of the Company and when defendants anticipated the Merger. The Merger allowed each Individual Defendant to avoid the negative public scrutiny and loss of Board seats that they anticipated by virtue of the actions taken by Engaged.

123. Moreover, defendants Prusch and Denzel with the rest of Outerwall's management, secured material financial benefits for competing the Merger:

| Name[1] | Cash ($)[2] | Equity ($)[3] | Perquisites/ Benefits ($)[4] | Other ($) | Total ($) |
|---|---|---|---|---|---|
| Erik E. Prusch | 3,919,315 | 9,682,780 | 36,227 | — | 13,638,322 |
| Nora M. Denzel | — | 135,252 | — | — | 135,252 |
| Galen C. Smith | 739,858 | 2,887,477 | 22,831 | — | 3,650,166 |
| Donald R. Rench | 597,569 | 2,088,521 | 22,831 | — | 2,708,921 |
| James H. Gaherity | 452,121 | 1,250,736 | 24,151 | — | 1,727,008 |
| David D. Maquera | 580,164 | 969,805 | 24,151 | — | 1,574,121 |

124. Moreover, defendant Brown received exactly what Engaged desired – an exit through the sale of the Company.

125. Moreover, defendant Smith received continuing employment from Apollo and Redbox's next CEO, and based on Apollo's past practices, likely received other equity-based incentives from Apollo in connection with the Merger.

126. The false representation that the Merger Projections reflected the more accurate view of the Company's future was material. The 14D-9 stated, on page 25, the following valuation ranges implied in Morgan Stanley's discounted cash flow analysis based on the Merger Projections versus the Growth Projections:

- Merger Projections: $41.00 to $49.50



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

- Growth Projections: $71.00 to $83.75

127. By promoting the Merger Projections, defendants misled stockholders into discounting the Growth Projections which demonstrated that the $52.00 per share Tender Offer price was an unfair and inadequate price for the Company's stock, thus ensuring that the Merger would be completed.

**The Omission of Segment-by-Segment Information**

128. In addition to and in conjunction with the false and misleading representation regarding the Merger Projections and Growth Projections, the 14D-9 was also materially misleading because it only included a summary of Outerwall's consolidated projections and failed to provide any information about the Company's specific lines of businesses.

129. The 14D-9 provided, on page 28 to 29, the revenue, adjusted EBITA, capital expenditures forecasts for years 2016 to 2020 for Outerwall's consolidated business, under the Merger Projections and the Growth Projections. An amendment to the 14D-9, filed September 16, 2016, provided the unlevered free cash flow forecasts for years 2016 to 2020 for Outerwall's consolidated business, under the Merger Projections and the Growth Projections.

130. The 14D-9's presentation of consolidated forecasts was devoid of any information about the Company's specific business components. However, as discussed above, while Redbox is expected to slowly decline, that decline is expected to be offset by growth initiatives, and gains from Coinstar and ecoATM. The Company has historically disclosed segment-by-segment financial information in recognition of the disparate potential for profit across Outerwall's business lines.

131. By omitting segment-by-segment information in the 14D-9, the Board knowingly obscured the major assumptions underlying the Merger Projections and the Growth Projections with respect to their disparate view of the relationship between the decline/growth trajectories of Redbox, Coinstar and ecoATM. By withholding this information, the Board made it difficult for stockholders to reject the Board's promotion of the Merger Projections as the most accurate view of the Company's future prospects. The omission rendered the disclosed consolidated summary

projections in the 14D-9 materially misleading. The omission was material in that it prevented stockholders from assessing the growth expectations of Coinstar and ecoATM, and misled stockholders about the value of Outerwall's prospects for growth.

**COUNT I**

**Violations of §14(e) of the Exchange Act**
**Against Outerwall and the Individual Defendants**

132. Plaintiff repeats and realleges each allegation as if fully set forth herein.

133. Section 14(e) of the Exchange Act, provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

134. Outerwall and the Individual Defendants prepared, reviewed, and/or disseminated the false and misleading 14D-9 which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135. As stated herein, the 14D-9 contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(e) of the Exchange Act. Outerwall and the Individual Defendants failed to correct the 14D-9. The omissions and false and misleading statements in the 14D-9 were material in that a reasonable stockholder would have considered them important in deciding whether to tender their shares in support of the Merger. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the 14D-9 and in other information reasonably available to stockholders.

136. The 14D-9 was an essential link in the consummation of the Merger. As a direct result of defendants' preparation, review, and dissemination of the false and/or misleading 14D-9, Plaintiff and the class were induced to tender their shares and accept inadequate consideration in connection with the Merger.


ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

137. Outerwall and the Individual Defendants knowingly made the false and misleading statements in the 14D-9. Outerwall and the Individual Defendants knew – by virtue of their Board and officer positions, their participation in the review of the Company's segment-by-segment performance on a quarterly and yearly basis, their participation in preparing and/or reviewing the Company's financial projections, their participation in the public statements made concerning the Company's segment-by-segment performance and prospects – that the assumptions underlying the Merger Projections were false and the Merger Projections did not reflect the most accurate view of the Company's future prospects. At all times relevant to the dissemination of the materially false and/or misleading 14D-9, defendants were aware of and/or had access to the true facts concerning Outerwall's true value, which was far greater than the value that Outerwall stockholders received.

138. As a direct result of defendants' preparation, review, and dissemination of the false and/or misleading 14D-9, Plaintiff and the class were induced to tender their shares and accept inadequate consideration of $52.00 per share and defendants were able to consummate the Merger. Thus, Plaintiff and the class have suffered damage and actual economic losses (*i.e.*, the difference between the Tender Offer consideration Outerwall stockholders received and Outerwall's true value) in an amount to be determined at trial.

139. By reason of the misconduct detailed herein, defendants are liable pursuant to §14(e) of the Exchange Act.

**COUNT II**

**Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

140. Plaintiff repeats and realleges each allegation set forth herein.

141. The Individual Defendants acted as controlling persons of Outerwall within the meaning of §20(a) of the Exchange Act.

142. By virtue of their positions as officers and/or directors and/or controlling stockholders of Outerwall, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9 filed with the SEC, the Individual

Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

143. Each of the Individual Defendants were provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

144. The Individual Defendants were directly involved in the making of the 14D-9.

145. Moreover, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have knowledge about the future prospects of the Company. Each of the Individual Defendants viewed the Merger Projections and the Growth Projections and received the fairness presentation from Morgan Stanley.

146. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in Plaintiff's favor and in favor of the Class and against defendants, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Declaring that defendants violated the federal securities laws as alleged herein by disseminating the 14D-9 in connection with the Tender Offer and the Merger, which contains materially false and misleading information;

C. Rescinding the Merger, or, in the alternative, if rescission is not feasible, awarding rescissory damages;

D. Awarding Plaintiff and the Class damages;



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F. Granting such other and further equitable and monetary relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury.

DATED: April 10, 2017

ROBBINS GELLER RUDMAN & DOWD LLP
DAVID T. WISSBROECKER (admitted *pro hac vice*)

DAVID T. WISSBROECKER

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
BRAD J. MOORE (WSBA # 21802)
3600 15th Avenue West, Suite 300
Seattle, WA 98119-1330
Telephone: 206/448-1777
206/728-2131 (fax)

Local Counsel for Plaintiff

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone: 212/802-1486
212/602-1592 (fax)

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 10, 2017.

s/ DAVID T. WISSBROECKER
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: DWissbroecker@rgrdlaw.com

# Mailing Information for a Case 2:16-cv-01275-JLR Abbas v. Outerwall Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Marc L. Ackerman**
  mackerman@brodsky-smith.com
- **Richard A. Acocelli**
  racocelli@weisslawllp.com,exec@weisslawllp.com
- **Ronald L Berenstain**
  rberenstain@perkinscoie.com,docketsea@perkinscoie.com,jstarr@perkinscoie.com
- **Sean C Knowles**
  sknowles@perkinscoie.com,tbrandon@perkinscoie.com,docketsea@perkinscoie.com
- **Thomas J McKenna**
  tjmlaw2001@yahoo.com,tjmckenna@gme-law.com,gmelawny@gmail.com
- **Bradley Jerome Moore**
  brad@stritmatter.com,pattis@stritmatter.com
- **Stephen J. Oddo**
  soddo@robbinsarroyo.com,notice@robbinsarroyo.com
- **Roger M Townsend**
  rtownsend@bjtlegal.com,shill@bjtlegal.com,admin@bjtlegal.com
- **Elizabeth K Tripodi**
  etripodi@zlk.com
- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,spatel@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`